## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RURAL & MIGRANT MINISTRY, ALIANZA NACIONAL DE CAMPESINAS, EL COMITE DE APOYO A LOS TRABAJADORES AGRÍCOLAS, FARMWORKER ASSOCIATION OF FLORIDA, MIGRANT CLINICIANS NETWORK, PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE, RURAL COALITION, UNITED FARM WORKERS, UNITED FARM WORKERS FOUNDATION,<br><br>      Plaintiffs,<br><br>      v.<br><br>UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and Andrew Wheeler, in his official capacity as Administrator of the United States Environmental Protection Agency,<br><br>      Defendants. | Civil Action No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      Plaintiffs Rural & Migrant Ministry, Alianza Nacional De Campesinas, El Comite De Apoyo a Los Trabajadores Agrícolas, Farmworker Association of Florida, Migrant Clinicians Network, Pineros y Campesinos Del Noroeste, Rural Coalition, United Farm Workers, and United Farm Workers Foundation (collectively, "Farmworkers"), seek declaratory and injunctive relief related to a final rule issued by the U.S. Environmental Protection Agency (EPA or Agency), Pesticides; Agricultural Worker Protection Standard; Revision of the Application Exclusion Zone Requirements, 85 Fed. Reg. 68,760-01, 68,762 (Oct. 30, 2020) (Final Rule), attached as Exhibit 1. The Final Rule unjustifiably weakens a regulatory safeguard against

pesticide poisoning known as the Application Exclusion Zone (AEZ). The AEZ was enacted by EPA to protect farmworkers and frontline communities from being poisoned by the drift of sprayed pesticides at the time of application. The Final Rule's erosion of this protection poses an unreasonable risk of harm to human health, in violation of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). EPA's decision to eliminate AEZ safeguards is an unlawful reversal of its position from just a few years ago, when it determined the AEZ was necessary to fulfill its duty under FIFRA. EPA reversed its position and promulgated the Final Rule despite lack of record support and, therefore, in violation of the Administrative Procedure Act (APA).

2.       Pesticides are inherently toxic chemicals used to kill or control pests. Many pesticides pose serious public health and environmental threats, but they are of particular concern for farmworkers, who face the highest levels of exposure to these toxic substances, and their families, who are exposed to pesticide residues from the workers' clothing and skin. Farmworkers provide essential labor that feeds our country, but they continue to face a number of societal and economic inequities that exacerbate the threats pesticides pose to their health, safety, and well-being.

3.       In 2015, EPA understood the vital and urgent need for additional protections from pesticides and created the AEZ. The Agency pointed to overwhelming evidence that people were still being sprayed by pesticides, both on and off of growing areas, despite existing protections, such as the "do not contact" provision. This evidence included data from state pesticide exposure databases and information from commenters and stakeholders. EPA established the AEZ to address one of the most common causes of pesticide poisoning: exposure to pesticide spray drift during applications. The AEZ provision provides that during an active pesticide application, no person can be within a 100-foot radius (or 25-foot radius for certain applications) of the pesticide

application equipment. If someone is in this radius, that is within the "Application Exclusion Zone," when a pesticide is being sprayed (other than a trained and equipped person involved in the pesticide application), the applicator must take a simple and common-sense step: suspend pesticide application immediately until the person has moved outside of the AEZ. The protections afforded by the AEZ apply whether the person who is in the radius is on the property of the grower or on neighboring property.

4.      On October 30, 2020, EPA published the Final Rule, which guts the AEZ protections by limiting its scope to the boundaries of the agricultural establishment, despite the fact that pesticide drift does not stop at property lines; allowing pesticide handlers to make or resume an application despite the presence of someone within the AEZ under certain circumstances; and reducing the AEZ from 100 feet to 25 feet for many applications.

5.      The Final Rule, which takes effect December 29, 2020, threatens the health and safety of farmworkers, farmworker families, and communities located near agricultural establishments. Without this protection in place, the rate of pesticide exposures is likely to rise, increasing the risk to millions of people of adverse health effects ranging from headaches, nausea, and skin rashes to pregnancy complications, difficulty breathing, unconsciousness, and, in severe cases, death.

6.      Plaintiffs, a group of organizations representing farmworkers and rural communities, respectfully request that the Court grant a temporary restraining order and/or preliminary injunction enjoining implementation of the rule, or a stay preventing the modified AEZ provision from taking effect until this case has been fully adjudicated, and then hold that (1) the Final Rule violates FIFRA because EPA promulgated it without substantial evidence that the modified AEZ would avert "unreasonable adverse effects" of pesticide use to workers and

3

bystanders and (2) that the Final Rule violates the APA because it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. In addition, Plaintiffs seek an order vacating the Final Rule.

### JURISDICTION AND VENUE

7.     This action arises under FIFRA, 7 U.S.C. § 136 et. seq., and the APA, 5 U.S.C. §§ 701–06. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States) and 5 U.S.C. § 702 (judicial review of agency actions).

8.     This Court has the authority to grant the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–202, and 5 U.S.C. §§ 702 and 706. This Court has the authority to grant the requested preliminary relief under 5 U.S.C. § 705 and Fed. R. Civ. Proc. 65.

9.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(e), because this civil action is brought against an agency of the United States and Plaintiff Rural & Migrant Ministry has its principal place of business in Poughkeepsie, New York, which is in this District, and no real property is involved in the action.

### PARTIES

10.     Plaintiff Rural & Migrant Ministry (RMM) is a statewide, non-profit organization founded in 1981 that advocates for, and works closely with, rural and migrant communities throughout New York. RMM works with rural leaders towards the creation of a just, rural New York State through nurturing leadership; standing with the disenfranchised, especially farmworkers and rural workers; and changing unjust systems and structures. RMM implements its mission through three programs: an accompaniment program, in which RMM accompanies and supports rural workers—most often, farmworkers—who seek to improve working and

living conditions; an education program to strengthen rural leaders; and a youth empowerment program committed to empowering rural children to create opportunities for themselves while at the same time learning how to change their world. The communities that RMM works with give direct input into RMM's programs and RMM staff frequently visit farms to speak with workers and learn about their concerns. RMM's stakeholders include farmworkers and rural communities who will be at increased risk of pesticide exposure as a result of the Final Rule. Furthermore, RMM's mission to advance a just and rural New York State in which farmworkers operate in safe working and living conditions cannot be fulfilled when worker protections like the AEZ are weakened. Thus, in order to notify farmworkers and communities about their increased vulnerability to pesticides as result of the Final Rule, and how to manage that increased risk, RMM is planning additional education and outreach programs for farmworkers on pesticide use and exposure if the Final Rule goes into effect.

11.     Plaintiff Alianza Nacional de Campesinas (Alianza), founded in 2011, is a national non-profit farmworker organization that serves the unique needs and concerns of our nation's more than 700,000 farmworker women and their families. Alianza's 15 member organizations include: Organización en California de Líderes Campesinas, Mujeres Luchadoras Progresistas, La Mujer Obrera, Workers' Center of Central New York, Workers Justice Center of New York, Mujeres Divinas, Centro de los Derechos del Migrante, Inc, Mujeres Campesinas Unidas de Florida, and fellow plaintiffs Asociación Campesina de Florida, Pineros y Campesinos Unidos del Noroeste, and Rural Coalition. Alianza works to build the capacity and leadership of farmworker women through its national organizing efforts, public education and outreach campaigns, and federal policy-advocacy work, a core prong of which is preventing exposure to pesticides. Alianza's members have suffered from exposure to off-target pesticide

5

drift, including pesticides landing on their homes, personal items and clothing, and in many instances, directly onto them and their children. As a result of pesticide exposure, Alianza members have suffered health impacts including reproductive harms, and the Final Rule increases their risk of such harms in the future. To protect farmworker women, their families, and others from pesticide exposure, Alianza and its member organizations have developed a national curriculum on pesticide safety, and they work to train staff and members of the community on pesticide exposure and the illnesses and health effects caused by it.

12.     Plaintiff El Comite de Apoyo a Los Trabajadores Agrícolas (The Farmworkers Support Committee or CATA) is a non-profit migrant farmworker organization founded in southern New Jersey in 1979 to empower and educate farmworkers. CATA, which is comprised of farmworker members who are actively engaged in the struggle for better working and living conditions, is dedicated to empowering and educating farmworkers through leadership development and capacity building. CATA operates in Southern New Jersey, parts of Pennsylvania, and the Delmarva Peninsula in Maryland. To fulfill its mission of improving its members' working and living conditions, CATA offers WPS safety training to farmworkers and documents pesticide safety practices on certain farms. CATA's members have suffered from exposure to off-target pesticide drift, and EPA's weakening of the AEZ increases their risk of such exposure.

13.     Plaintiff Farmworker Association of Florida (FWAF) is a non-profit organization based in Florida. More than 8,000 families are members of FWAF, which has five locations throughout Central and South Florida. FWAF conducts programs and activities that build leadership and activist skills among low-income communities of color who are disproportionately affected by pesticide exposure and health problems as well as environmental

6

contamination, racism, exploitation, and political under-representation. FWAF's long-standing

mission is to build power among farmworker and rural low-income communities to respond to

the myriad of workplace, economic, health, and environmental justice issues that impact their

lives. FWAF is familiar with personal accounts of farmworkers' suffering the consequences of

off-target pesticide drift. EPA's Final Rule increases the likelihood that workers, including

FWAF's members, will experience both immediate and long-term health effects from pesticide

exposure.

   14. Plaintiff Migrant Clinicians Network (MCN) is a national non-profit organization

with more than 10,000 constituent clinicians who work in community health centers and other

health care delivery sites to provide care for migrants, of which many are farmworkers and live

near farms. To serve immigrants, health centers, and clinicians, MCN develops appropriate

resources, engages outside partners, directs a worldwide continuity of care service, provides

continuing education, and runs programs that support clinical care on the front lines of health

care for immigrant workers, their families, and other underserved populations. Pesticide

exposure is a pressing concern for the populations MCN serves and MCN advocates for policy

changes and reform regarding pesticide use. To that end, MCN has actively advocated for a

stronger WPS that would guard farmworkers against pesticide exposure, and it strongly objected

to EPA's decision to weaken the WPS. In response to EPA's Final Rule, farmworkers, migrants,

and others that MCN serves will be at increased risk of pesticide exposure and adverse health

impacts and thus MCN will have to place greater focus on training and education on the

treatment of pesticide injuries and illness, diverting resources needed for other activities.

   15. Plaintiff Pineros y Campesinos Unidos del Noroeste (Northwest Treeplanters

and Farmworkers United or PCUN), founded in 1985, is Oregon's only farmworker union and

the largest Latino organization in the state. Based in Woodburn, Oregon—the center of Oregon's agricultural industry—PCUN's mission is to empower farmworkers to recognize and take action against systematic exploitation and all of its effects. Since its founding, PCUN has registered over 6,000 members, 98 percent of whom are immigrants from Mexico and Central America. Approximately one-third of PCUN's members come from indigenous communities in Mexico and speak indigenous languages, but little to no English or Spanish. Many of PCUN's members have experienced the dangerous effects of pesticide exposure at work. In addition, many PCUN members live very close to areas where pesticides are applied, and, as a result, they and their family members are threatened by exposure due to pesticide drift even in their homes. PCUN has worked to raise awareness among its members about the dangers of pesticide exposure.

16.     Plaintiff Rural Coalition amplifies the voices of its 50 grassroots member organizations, representing African American, American Indian, Asian American, Euro-American, Latino, and women farmers, ranchers, farm workers, and rural communities. Rural Coalition and its members seek just and sustainable food systems, fair working conditions and dignity for farmworkers and food chain workers, protection of the earth, and safe, adequate, and healthy food for all. Many of Rural Coalition's members are farmers, farmworkers, or individuals who live in rural areas where large amounts of pesticides are applied to crops, and Rural Coalition's members are exposed to pesticides through pesticide drift. Rural Coalition has heard of workers who were sprayed with pesticides directly and suffered severe illness as a result, and Rural Coalition's members regularly report exposure to pesticide drift. Due to their jobs and where they live, Rural Coalition's members are at increased risk of pesticide exposure if the Final Rule takes effect.

8

17.     Plaintiff United Farm Workers (UFW) is the nation's oldest and largest farmworker membership organization. UFW is headquartered in California and serves farmworkers in offices all across the country. UFW has represented farmworkers for more than 40 years and currently has more than 45,000 members, many of whom are migrant and seasonal farmworkers. UFW's mission is to protect and expand farmworkers' labor rights, including rights pertaining to health and safety issues. Many of UFW's members have reported being exposed to pesticides and developing pesticide-related illnesses, including skin rashes, eye irritation, nausea and dizziness, pregnancy complications, miscarriages, and permanent disability. In many instances, UFW's members were exposed due to off-target pesticide drift. Exposure due to off-target drift is common because many farmworkers and their family members work, live, or attend school in areas that border farmlands. EPA's weakening of the AEZ will place UFW members and their families at a heightened risk of pesticide exposure because of the frequency of off-target pesticide drift.

18.     Plaintiff United Farm Workers Foundation (UFW Foundation) is a dynamic non-profit organization established in 2006 with the core purpose of empowering communities to ensure human dignity. UFW Foundation's regional offices are safe havens that provide resources and services—such as credible immigration legal representation—and act as hubs for educational outreach and organizing. UFW Foundation is a sister organization to the United Farm Workers labor union, and it serves over 100,000 farmworkers and low-income community members in California and Arizona. UFW Foundation members work on farms where pesticides are sprayed, and they have been exposed to and harmed by pesticide drift.

19.     Plaintiffs' members include farmworkers who live and work in areas where there is heavy pesticide use. They, along with their children and other family members, face a high

risk of pesticide poisoning through spray drift, which causes severe health harms. They depend

on provisions, such as the AEZ, to protect them from exposure to pesticides from off-target

drift. Any weakening of such protections threatens to expose them to an unreasonable risk of

harm.

20.     Defendant EPA is an agency of the United States government.

21.     Defendant Andrew Wheeler, Administrator of the EPA, has oversight authority

for all actions taken by EPA and is responsible for ensuring the Agency's compliance with the

law. Defendant Wheeler is sued in his official capacity.

## LEGAL BACKGROUND

## I.      FIFRA AND THE AGRICULTURAL WORKER PROTECTION STANDARD

22.     EPA is required by, and authorized under, FIFRA to ensure that workers, their

families, and surrounding communities are protected from pesticides. Specifically, EPA must

ensure that the use of pesticides does not cause "any unreasonable risk to man or the

environment, taking into account the economic, social, and environmental costs and benefits of

the use of any pesticide." *See* 7 U.S.C. §§ 136(bb), 136a. Congress intended FIFRA to protect

man and the environment, and farmers and farmworkers are the most obvious objects of the

statute's protection. EPA must support the decisions it makes under FIFRA with "substantial

evidence when considered on the record as a whole." *Id.* § 136n(b).

23.     Pursuant to this authority, EPA has implemented measures to protect workers,

pesticide handlers, and others from pesticide exposure in two primary ways: (1) through specific

use instructions and restrictions on pesticide product labeling, and (2) through the Agricultural

Worker Protection Standard (WPS), 40 C.F.R. pt. 170. *See* Pesticides; Agricultural Worker

Protection Standard Revisions, 80 Fed. Reg. 67,496, 67,500 (Nov. 2, 2015).

24.     The WPS, originally promulgated in 1974 and substantively revised in 1992 and

again in 2015, is a uniform set of requirements for farmworkers, pesticide handlers, and their

employers that provides a comprehensive collection of pesticide management practices that

apply to agricultural pesticide use in crop production and complements the product-specific

requirements on individual pesticide product labels. *Id*. In EPA's own words, "[t]he WPS plays

an important role in reducing the risk of pesticide illness and injury among agricultural workers

and pesticide handlers" because it "offers occupational protections to over 2 million agricultural

workers . . . and pesticide handlers . . . who work at over 600,000 agricultural establishments

(farms, forests, nurseries and greenhouses)." EPA Office of Inspector General, EPA Needs to

Evaluate the Impact of the Revised Agricultural Worker Protection Standard on Pesticide

Exposure Incidents, Report No. 18-P-0080 at 13 (Feb. 15, 2018),

https://www.epa.gov/sites/production/files/2018-02/documents/_epaoig_20180215-18-p-

0080.pdf.

25.     The WPS—with its three key components of information, protection, and

mitigation—is "designed to reduce the risks of illness or injury resulting from workers' and

handlers' occupational exposures to pesticides used in the production of agricultural plants on

farms or in nurseries, greenhouses, and forests and also from the accidental exposure of workers

and other persons to such pesticides." 40 C.F.R. § 170.1. It is "designed to *reduce or eliminate

exposure to pesticides* and establishes procedures for responding to exposure-related

emergencies." *Id.* (emphasis added).

26.     "Workers" protected by the WPS are individuals who are employed to "perform[]

activities relating to the production of agricultural plants on an agricultural establishment . . . ."

40 C.F.R. § 170.3. "Handlers" are individuals employed by an agricultural establishment or

11

commercial pesticide handling establishment who, among other things, mix, load, or apply

pesticides; dispose of pesticides; or handle opened containers of pesticides. *Id.*

## II.     ADMINISTRATIVE PROCEDURE ACT

27.     The APA provides for judicial review of agency action, 5 U.S.C. § 702, and

requires the reviewing court to "hold unlawful and set aside agency action . . . found to be

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

§ 706(2)(A). An agency acts in a manner that is arbitrary and capricious when it reverses its

position on a policy choice without providing a "reasoned explanation. . . for disregarding facts

and circumstances that underlay or were engendered by the prior policy." *Fed. Commc'ns*

*Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). An agency also acts in a

manner that is arbitrary and capricious when it fails to "examine the relevant data and articulate

a satisfactory explanation for its action" and when it has "entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43–44 (1983).

## FACTUAL BACKGROUND

## I.     PESTICIDE EXPOSURE AMONG AGRICULTURAL WORKERS, THEIR FAMILIES, AND COMMUNITIES NEAR FARMS

28.     The approximately 2.1 million farmworkers who are employed annually on crop

farms in this country are laboring in an industry known to be among the most hazardous. *See*

*National Institute of Occupational Safety and Health (NIOSH), Agricultural Safety,* Center for

Disease Control and Prevention, https://www.cdc.gov/niosh/topics/aginjury/default.html.

29.     EPA estimates that approximately 1,800 to 3,000 acute pesticide exposure incidents occur each year on agricultural establishments covered by the WPS. *See* 80 Fed. Reg. at 67,502. Although these figures account for underreporting, they necessarily are estimates, given that studies suggest that underreporting of pesticide exposure by farmworkers and handlers ranges from 20 to 90 percent. *See* Pesticides; Agricultural Worker Protection Standard Revisions, 79 Fed. Reg. 15, 444, 15,449 (Mar. 19, 2014).

30.     Health incident surveillance data and studies show that workers and handlers bring home pesticide residues on their bodies and clothing and thereby also expose family members, including children, to pesticides. *See* 80 Fed. Reg. at 67,502.

31.     Moreover, these figures do not include the more difficult to quantify chronic pesticide exposure that a sizeable portion of the agricultural workforce may be subjected to, which poses significant short and long-term health risks. *See* 80 Fed. Reg. at 67,498-99. Peer-reviewed scientific literature demonstrates well-documented associations between pesticide exposure and certain cancer and non-cancer chronic health effects. *See* 79 Fed. Reg. at 15,450; *see also*, Fenske R.A., et. al., *Breaking the take home pesticide exposure pathway for agricultural families: workplace predictors of residential contamination*, 56 Am. J. Indus. Med. 1063-71 (2013); Shelton J.F. et. al., *Neurodevelopmental disorders and prenatal residential proximity to agricultural pesticides: the CHARGE study*, 122 Env't Health Persp. A266 (2014); Paul K. Mills & Sandy Kwong, *Cancer Incidence in the United Farmworkers of America (UFW), 1987-1997,* 40 Am. J. Indus. Med. 596, 599 (2001) (finding that, compared to the general population, farmworkers had a 59% higher rate of leukemia, a 69% higher rate of stomach cancer, a 63% higher rate of uterine/cervical cancer, and a 68% higher rate of uterine corpus cancer); Vincent F. Garry et al., *Pesticide Appliers, Biocides and Birth Defects in Rural*

13

*Minnesota,* 104 Env't Health Persp. 394, 395–98 (1996) (birth defect rate was significantly

increased in children born to pesticide appliers); Elizabeth Grossman, *From the Fields to Inner*

*City, Pesticides Affect Children's IQ*, Yale Env't 360 (May 16, 2011),

https://e360.yale.edu/features/from_the_fields_to_inner_city_pesticides_affect_childrens_iq#:~:t

ext=The%20New%20York%20study%20found,greater%20the%20impact%20on%20cognitio

(babies exposed to high levels of common pesticides in utero have lower I.Q. scores than their

peers by the time they reach school age, according to three new studies); Freya Kamel & Jane A.

Hoppin, *Association of Pesticide Exposure with Neurologic Dysfunction and Disease*, 112 Env't

Health Persp. 950, 950 (2004) (poisoning by acute high-level exposure to certain pesticides has

well-known neurotoxic effects; most studies of moderate pesticide exposure have found

increased prevalence of neurologic symptoms and changes in neurobehavioral performance,

reflecting cognitive and psychomotor dysfunction); Victoria McGovern, *Autism and Agricultural*

*Pesticides: Integrating Data to Track Trends*, 115 Env't Health Persp. A504, A504 (Oct. 2007),

(finding an association between autism spectrum disorders and prenatal exposure to

organochlorine pesticides); Caroline M. Tanner et al., *Rotenone, Paraquat, and Parkinson's*

*Disease*, 119 Env't Health Persp. 866, 868–69 (June 2011), (finding that Parkinson's Disease is

positively associated with two classes of pesticides).

   32.  One of the most common contributors to farmworker pesticide exposure is off-

target drift that occurs when a sprayed pesticide moves beyond its intended target. EPA

previously found that as much as 37% to 68% of acute pesticide-related illnesses in agricultural

workers are caused by spray drift. *See* 79 Fed. Reg. at 15,448.

   33.  Homes, schools, and community spaces are often located next to farms, and

community members in these areas are at risk of pesticide exposure due to off-target drift. For

example, Pedro Olivares, a farmworker at a fernery in Pierson, Florida, lives directly next to the fernery and he states that when it sprays pesticides, he can smell them inside his house and feel them inside his mouth and nose and on his skin. *See* Earthjustice, *Photo Essay: Pesticide Exposure in Muck Fields & Ferneries in Florida*, https://earthjustice.org/features/pesticide-exposure-in-muck-fields-and-ferneries-in-florida. Renato Hernandez, another farmworker in Pierson, also lives directly next to a fernery, and he explains that the fernery does not provide any notice before it sprays pesticides, so it is difficult to take precautions to prevent them from entering his home. *Id.* In Grandview, Washington, a children's nursery is across the street from an orchard, and two day care centers are within a few feet of orchards. *See* Comments of Alianza Naciónal de Campesinas, et. al., Comment ID No. EPA-HQ-OPP-2017-0543-0136, at 11–12 (Jan. 30, 2020) ("Farmworker Comments"), attached as Exhibit 2. In San Benito, Texas, the parking lot of a lumber company is less than 50 feet from a cornfield, and a school is approximately 100 feet from a cornfield. *Id.* at 14. Community members who live near, work near, and visit these places are all at risk of pesticide exposure due to off-target drift.

34.     The high risks associated with labor in the agricultural sector—for workers and their families—are particularly troubling in light of the societal and economic challenges facing the populations that largely occupy this sector. According to the Department of Labor, 70% of agricultural workers in the United States were born in Mexico, and Central and South America. *See* 80 Fed. Reg. at 67,502. Approximately 65% of these workers speak little or no English, and many have received minimal formal education. *Id.* A vast majority of agricultural workers do not have access to employer-provided health-insurance, and most workers fear seeking medical treatment, as they fear being replaced or fired for being "troublemakers." *Id.* A majority of workers reported a total family annual income below $22,500, *id.*, and many do not have

permanent housing and generally live close to the agricultural areas where they work and where pesticides are applied. *See* 79 Fed. Reg. at 15,457.

## II.    THE 2015 REVISIONS TO THE WORKER PROTECTION STANDARD

35.     In 2014, EPA issued a proposed rule to revise the WPS in light of data showing that the existing 1992 rule was inadequate to protect against pesticide poisoning. *Id.* at 15,450. There was "strong evidence that workers and handlers may be exposed to pesticides at levels that can cause adverse effects and that both the exposures and the risks can be substantially reduced" through more protective regulations. *Id.* at 15,446.

36.     At that time, the main protections in place for agricultural establishments during pesticide application were (1) a prohibition on allowing or directing any worker to enter or remain in a treated area, and (2) a requirement that handler employees ensure that pesticides are applied in a manner that will not contact a worker either directly or through drift, *i.e.* the "do not contact" provision. 80 Fed. Reg. at 67,522. The WPS has long included this "do not contact" provision, which was first added to Part 170 of the C.F.R. in 1974. *See* Worker Protection Standards for Agricultural Pesticides, 39 Fed. Reg. 16,825, 16,890 (May 10, 1974).

37.     However, after reviewing numerous cases of workers who were sprayed with pesticides, EPA concluded that "experiences such as those of workers having to move to get out of the way of the tractor that was applying pesticide . . . and workers being directly sprayed confirm EPA's position that additional protections [were] necessary during pesticide applications on farms and in forests." 80 Fed. Reg.at 67,522. EPA thus finalized amendments to the WPS in 2015 including adding the AEZ and a host of other enhanced safeagurds.

38.     The 2015 amendments adding the AEZ, and EPA's position on the need for enhanced protections, were also based on three studies on pesticide exposure. One study found

16

that between 1998 and 2005 there were 1,942 separate events where agricultural workers were

exposed to pesticides. *See id.* at 67,520–521; *see also* Calvert et al., (2008). The authors

determined that agricultural workers have an elevated risk for acute pesticide poisoning

compared to other industries, *id.* at 893, and found the most common factor related to pesticide

exposure was off-target drift from nearby application. *See id.* at 891.

39.     The second study considered 3,646 cases of acute pesticide illness and injury to

agricultural workers, of which 2,534 were to farmworkers. *See* Edward J. Kasner et al., *Gender

Differences in Acute Pesticide-Related Illnesses and Injuries Among Farmworkers in the United

States, 1998-2007, 55 Am. J. Indus. Med.* 571, 574 (2012). This study too found that the most

commonly identified contributing factor was exposure to off-target drift: 80.2% of non-handler

females and 64.7% of non-handler males who suffered from exposure were exposed due to drift.

*Id.* at 575.

40.     The third study EPA referenced is Soo-Jeong Lee et al., *Acute Pesticide Illnesses

Associated with Off-Target Pesticide Drift from Agricultural Applications*, 119 Env't Health

Persp. 1162 (2011), *see* 80 Fed. Reg. at 67,520–521. The study authors identified 643 events

and 2,945 illness cases associated with pesticide drift from agricultural applications, including

both occupational and nonoccupational cases. *See* Soo-Jeong (2011) at 1163. Based on their

findings, they estimate that 14% to 24% of total occupational pesticide poisoning may be

attributed to off-target drift. *Id.* at 1166. Meanwhile, over half of the drift-related cases were

nonoccupational, and residents of agriculture-intensive regions in California had a 69 times

higher risk of pesticide poisonings from drift. *Id.* at 1167. Children were at the highest risk

among nonoccupational cases. *Id*. The study found many cases of drift exposure beyond the

boundaries of the establishment, including on private residences (44.5%), on roads or right-of-ways (5.6%), and on school property (3.6%). *Id.*

41.     These studies, along with personal accounts of workers' and bystanders' being sprayed by pesticide drift, showed that people were being sprayed by pesticides despite the "do not contact" provision. On the basis of this evidence, in deciding to add the AEZ, EPA noted that it expressly "disagree[d] with the assertion that the 'do not contact' requirements, along with the other protections on pesticide labels, are by themselves sufficient to protect workers and bystanders from being directly contacted by pesticides that are applied." 80 Fed. Reg. at 67,521.

42.     The 2015 amendment to the WPS strengthened elements of the then-existing regulation, including setting a minimum age of 18 years old for handlers and workers performing certain tasks and improving pesticide safety and hazard communication. EPA intended its revision of the WPS to "reduce avoidable incidents by improving information, protections, and mitigations for workers and handlers without imposing unreasonable burdens on employers." *Id.* at 67,502.

43.     One important element of the 2015 rule's improvement on the 1992 rule was the promulgation of the AEZ. The AEZ:

> is the area that extends 100 feet horizontally from the application equipment in all directions during application when the pesticide is applied by any of the following methods: (A) Aerially. (B) Air blast application. (C) As a spray using a spray quality (droplet spectrum) of smaller than medium (volume median diameter of less than 294 microns). (D) As a fumigant, smoke, mist, or fog.

40 C.F.R. § 170.405(a)(1)(i).  For other applications,

> the application exclusion zone is the area that extends 25 feet horizontally from the application equipment in all directions . . . when the pesticide is . . . sprayed from a height of greater than 12 inches from the planting medium using a spray quality

18

(droplet spectrum) of medium or larger (volume median diameter of 294 microns or greater).

*Id.* § 170.405(a)(1)(ii). During application,

the agricultural employer must not allow or direct any worker or other person, other than an appropriately trained and equipped handler involved in the application, to enter or to remain in the treated area or an application exclusion zone that is within the boundaries of the establishment until the application is complete.

*Id.* § 170.405(a)(2). Handlers must immediately suspend a pesticide application if any worker or other person, other than an appropriately trained and equipped handler involved in the application, is in the application exclusion zone. *Id.* § 170.505(b).

44.     EPA designed the AEZ to extend beyond the boundaries of the agricultural establishment based, in part, on its finding that "[o]ut of 17 incidents [of people being sprayed by pesticides] identified in the comments, only one would have been prevented if the application exclusion zone was limited to the boundaries of the agricultural establishment. . . ." 80 Fed. Reg. at 67,524. Extending the AEZ beyond the boundaries of the agricultural establishment "would have prevented at least four of the incidents reported in the comments, and possibly as many as 12." *Id.* EPA also noted that "incidents cited by commenters show that workers are directly exposed to pesticide applications from neighboring establishments as well." *Id.*

45.     EPA anticipated that the additional safeguards it was promulgating would "prevent unreasonable adverse effects from exposure to pesticides among agricultural workers and pesticide handlers, vulnerable groups (such as minority and low-income populations, child farmworkers, and farmworker families) and other persons who may be on or near agricultural establishments." *Id.* at 67,496.

46.     EPA estimated the benefits of the 2015 rule to exceed $64 million per year "in terms of avoided costs associated with occupational pesticide incidents and with reductions in

chronic diseases associated with occupational pesticide exposure." *Id.* at 67,498. EPA found that

the costs of the 2015 rule would be "negligible" because "employers could generally reassign

workers to other tasks for the duration of the pesticide application in instances where worker

tasks in the adjacent areas had to be stopped until the application was complete." *Id.* at 67,525.

EPA concluded that "the benefits of these requirements outweigh the negligible costs." *Id.*

47.     The AEZ provisions of the 2015 Rule were scheduled to go into full effect in

January 2018.

**III.     The Regulatory Reform Agenda**

48.     Less than two years after EPA promulgated the 2015 rule, on March 1, 2017, the

Trump Administration published Executive Order 13,777, *Enforcing the Regulatory Reform*

*Agenda*, to "alleviate unnecessary regulatory burdens." Exec. Order No. 13,777, 82 Fed. Reg.

12,285 (Feb. 24, 2017). It required agencies to form "Regulatory Reform Task Forces" to

identify regulations for repeal, replacement, or modification. In response, on April 11, 2017,

EPA issued in the Federal Register a request for public comment to identify such regulations.

*See* Evaluation of Existing Regulations, 82 Fed. Reg. 17,793-01 (Apr. 13, 2017). The Agency

received over 460,000 comments, a handful of which suggested modification and/or revocation

of the AEZ provision of the WPS. *See, e.g.*, Comments of NASDA, Doc. ID. No. EPA-HQ-OA-

2017_0190_56233 (May 15, 2017).

49.     In May 2017, a coalition of farmworker advocates, including many who are

plaintiffs in this action, wrote a letter to then-EPA Administrator Scott Pruitt opposing any delay

by EPA in implementing the 2015 Worker Protection Standard amendments. Among other

things, the letter detailed why delay was unnecessary, noting that the WPS rulemaking process

afforded stakeholders multiple opportunities for engagement and stressed that any delay would

violate EPA's FIFRA obligations and the APA. *See* Letter from California Rural Legal

Assistance Foundation et al. to Scott Pruitt, Administrator, EPA (May 11, 2017).

50.     In spite of this, on December 21, 2017, EPA published a notice signaling its intent

to roll back three key provisions of the WPS: the provision raising the minimum age for

pesticide handlers to 18, the provision requiring agricultural employers to provide pesticide

information and safety data to a designated representative, and the AEZ provision. *See*

Pesticides; Agricultural Worker Protection Standard; Reconsideration of Several Requirements

and Notice about Compliance Dates, 82 Fed. Reg. 60,576-01 (Dec. 21, 2017). It did so despite

the fact that, only weeks earlier, the Pesticide Program Dialogue Committee ("PPDC")— a

federal advisory committee consisting of diverse stakeholders including regulators and

growers—met and concluded that enforcement and compliance issues with the AEZ were

manageable through guidance, education, and training, and that no further rulemaking was

needed. *See* EPA, Transcript of PPDC November 2, 2017 Meeting at 123–24.

51.     On March 8, 2019, Congress enacted the Pesticide Registration Improvement Act

of 2018 ("PRIA 4"). PRIA 4 required that

> during the period beginning on the date of enactment of this Act and ending not earlier than
> October 1, 2021, [EPA] (1) shall carry out (A) the final rule of the Administrator entitled
> ''Pesticides; Agricultural Worker Protection Standard Revisions'' (80 Fed. Reg. 67496
> (November 2, 2015)); and (B) the final rule of the Administrator entitled ''Pesticides;
> Certification of Pesticide Applicators'' (82 Fed. Reg. 952 (January 4, 2017)); and (2) shall
> not revise or develop revisions to the rules described in subparagraphs (A) and (B) of
> paragraph (1).

PRIA 4, P.L. 116-8 § 7(a) (Mar. 8, 2019). An exception allowed that:

> Prior to October 1, 2021, the Administrator may propose, and after a notice and public
> comment period of not less than 90 days, promulgate revisions to the final rule described
> in subsection (a)(1)(A) addressing application exclusion zones under part 170 of title 40,
> Code of Federal Regulations, consistent with the Federal Insecticide, Fungicide, and
> Rodenticide Act (7 U.S.C. 136 et seq.).

PRIA 4, P.L. 116-8 § 7(b) (Mar. 8, 2019).

### IV.    PUBLICATION OF PROPOSED AND FINAL RULE

52.    On November 1, 2019, EPA published a proposal to roll back provisions of the AEZ. *See* Pesticides; Agricultural Worker Protection Standard; Revision of the Application Exclusion Zone Requirements, 84 Fed. Reg. 58,666-01 (Nov. 1, 2019) A number of the Plaintiffs submitted detailed comments in opposition. *See* Farmworker Comments.

53.    In these comments, Plaintiffs submitted new studies that supported increasing the distance of the AEZ—not weakening it. For example, a study by Edward J. Kasner et al. took samples downwind in an apple orchard where pesticides were sprayed by an axial fan airblast sprayer. *See* Edward J. Kasner et al., *Spray Drift from a Conventional Axial Fan Airblast Sprayer in a Modern Orchard Work Environment*, 62 Annals Work Exposures & Health 1134 (2018). Pesticide drift was measured as far as 52 meters downwind, 1.7 times greater than the 30 meter (approximately 100 feet) AEZ.  *Id.* at 1143. A study by Magali N. Blanco et al., also looked at drift in an orchard block sprayed by an axial fan airblast sprayer. The study found significant amounts of drift at all measured distances, from 16 to 74 meters. *See* Magali N. Blanco et al.*, Real-time Particle Monitoring of Pesticide Drift from an Axial Fan Airblast Orchard Sprayer,* 29 J. Exposure Sci. & Envtl. Epidemiology 397, 402 (2019).The authors concluded: "the current AEZ may not completely protect workers from nearby drift."  *Id.*

54.    EPA received 126 unique comments on the proposed rollback. Of these, 110 opposed the changes to the AEZ, noting the increased risk of pesticide poisoning posed by the proposed amendment and the lack of justification for it. *See, e.g.*, Comments of Southern Migrant Legal Services, Docket ID No. EPA-HQ-OPP-2017-0543-0114 (Jan. 30,

2020); Comments of the Child Labor Coalition, Docket ID No. EPA-HQ-OPP-2017-0543-0109 (Jan. 27, 2020).

55.     Despite this clear message from commenters, including directly impacted stakeholders, on October 30, 2020, EPA finalized the proposal with few changes. Absent action by this court, the Final Rule is set to go into effect on December 29, 2020.

56.     The Final Rule weakens the AEZ in a number of ways. First, it limits the AEZ protections to the boundaries of the agricultural establishment, despite the fact that pesticide drift does not stop at property lines. *See* 85 Fed. Reg. 68,760, 68,781–782. Second, it allows pesticide handlers to make or resume an application despite the presence of someone within the AEZ who is not employed by the establishment but who is in the area subject to an easement. *Id.* And third, it eliminates language and criteria pertaining to spray quality, droplet size, and volume median diameter and instead establishes a uniform 25-foot AEZ for all sprayed applications made from a height greater than 12 inches (which reduces the AEZ to 25 feet from 100 feet for many applications). *Id.* at 68,781.

57.     EPA explained that its decision to finalize rollback rests on the premise that the "do not contact" provision, coupled with more training on how to comply with that provision, guarantees the same level of protection against pesticide exposure that the original AEZ provision provided. *Id.* at 68,769.

58.     EPA also claims as support for the Final Rule that "the AEZ imposes burdens that are disproportionate to the need for the extra measure of assurance the AEZ is intended to provide." 85 Fed. Reg. at 68,768. It also states that it "is unable to quantify any increased risk of pesticide exposure from revising the AEZ requirements." EPA, *Cost Analysis for Revisions to*

*the Application Exclusion Zone in the Agricultural Worker Protection Standard; Final Rule* 10–11 (October 2020).

59.     The Final Rule provides no new evidence or information that supports overturning EPA's 2015 finding that the "do not contact" provision was insufficient to prevent unreasonable risk to farmworkers. Without adequately addressing or acknowledging EPA's prior position, EPA bases the Final Rule on the premise that the "do not contact" provision is sufficiently protective of farmworkers, and thus curtailing the AEZ will have no adverse impacts to human health.

60.     The Final Rule fails to consider the slew of record evidence, including evidence in the 2015 record, demonstrating that the "do not contact" provision allows pesticide exposure from drift to occur at alarming rates.

61.     The Final Rule fails to consider the increased risk of harm to farmworkers imposed by weakening the AEZ protections, and EPA provides no evidence to demonstrate that frontline communities will be protected against unreasonable risks of pesticide use or that the absence of AEZ protections will not lead to an unreasonable risk of harm.

62.     The Final Rule fails to consider the costs imposed by curtailing the AEZ provision and increasing farmworkers' exposure to pesticide through drift.

63.     Because of the Final Rule, Plaintiffs and their members have lost essential safeguards from pesticide poisonings. The Final Rule harms Plaintiffs and their members, many of whom are farmworkers laboring in areas where pesticides are sprayed regularly, by increasing their risk of exposure to pesticide due to drift.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION: VIOLATION OF FIFRA

24

64.     The allegations set forth above are incorporated by reference.

65.     FIFRA requires that EPA determine for each registered pesticide that, "when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment," 7 U.S.C. § 136a(c)(5)(D), which is defined as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide,"  7 U.S.C. §§ 136(bb).

66.     EPA must support the decisions it makes under FIFRA with "substantial evidence when considered on the record as a whole." *Id.* § 136n(b).

67.     EPA promulgated the Final Rule without substantial evidence, based on the record as a whole, that if pesticides are applied without the full protections of the AEZ they "will not generally cause unreasonable adverse effects."

68.     Evidence in the record shows that the Final Rule's erosion of protections provided by the AEZ will cause an unreasonable risk of harm to farmworkers and their families and communities surrounding agricultural operations, including to Plaintiffs and their members.

69.     The Final Rule violates FIFRA's prohibition against pesticide use that causes unreasonable risk of harm.

70.     Defendants' violation will harm Plaintiffs and their members.

### SECOND CAUSE OF ACTION: VIOLATION OF THE APA

71.     The allegations set forth above are incorporated by reference.

72.     The APA prohibits an agency from acting in a manner that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

73.     An agency acts in a manner that is arbitrary and capricious when it fails to "examine the relevant data and articulate a satisfactory explanation for its action" and when it has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43–44 (1983).

74.     An agency acts in a manner that is arbitrary and capricious when it reverses its position on a policy choice without providing a "reasoned explanation. . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

75.     With the Final Rule, EPA reversed its 2015 policy that the "do not contact" provision is insufficient to protect bystanders, without providing a reasoned explanation for its reversal.

76.     The Final Rule's justification that the "do not contact" provision is adequately protective, and that the AEZ offered no additional protection, runs counter to the evidence before the Agency.

77.     The Final Rule fails to consider an important aspect of the problem, including that pesticide drift is a serious exposure concern that impacts bystanders beyond the boundaries of the property.

78.     The Final Rule is arbitrary and capricious because EPA conducted and relied on a flawed cost-benefit analysis that entirely ignored the costs of increasing bystander exposure to pesticide drift.

79.     The Final Rule violates FIFRA, as explained above, and thus is "not in accordance with law." 5 U.S.C. § 706(2)(A).

80.     Defendants' violation will harm Plaintiffs and their members.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.      Grant a temporary restraining order and/or preliminary injunction of the Final Rule, pursuant to Fed. R. Civ. P. 65, or, in the alternative, postpone the effective date of the Final Rule pending judicial review pursuant to 5 U.S.C. § 705;

2.      Declare that the Final Rule violates FIFRA and the APA, as described above;

3.      Enjoin the EPA and all its officers, employees, and agents, and anyone acting in concert with them, including State agencies charged with enforcing the WPS, from implementing, applying, or taking any action whatsoever under the Final Rule;

4.      Direct EPA to provide actual notice through personal service or otherwise to State agencies charged with enforcing the WPS that the Final Rule is preliminarily enjoined and direct State agencies to so inform any local entities in their jurisdiction who share responsibility for enforcing the WPS;

5.      Vacate and set aside the Final Rule in its entirety;

6.      Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, associated with this litigation; and

7.      Grant Plaintiffs such further and additional relief as the Court deems just and proper.


Respectfully submitted this 16th day of December, 2020,

27

/s/ Eve Gartner

Eve Gartner
Surbhi Sarang
Kara Goad *(Pro Hac Vice motion to be submitted)*
Earthjustice
48 Wall Street, 19th Floor
New York, NY 10005
egartner@earthjustice.org
ssarang@earthjustice.org
kgoad@earthjustice.org

Carrie Apfel *(Pro Hac Vice motion to be submitted)*
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC 20001
capfel@earthjustice.org

Iris Figueroa *(Pro Hac Vice motion to be submitted)*
Trent Taylor *(Pro Hac Vice motion to be submitted)*
Farmworker Justice
1126 16th St., NW, Suite LL-101
Washington, DC 20036
ifigueroa@farmworkerjustice.org
ttaylor@farmworkerjustice.org

*Counsel for Plaintiffs*