UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                      :

| | |
|---|---|
| RURAL & MIGRANT MINISTRY, ALIANZA | : |
| NACIONAL DE CAMPESINAS, EL COMITE DE | : |
| APOYO A LOS TRABAJADORES AGRÍCOLAS, | : |
| FARMWORKER ASSOCIATION OF FLORIDA, | : |
| MIGRANT CLINICIANS NETWORK, PINEROS Y | : |
| CAMPESINOS UNIDOS DEL NOROESTE, RURAL | : |
| COALITION, UNITED FARM WORKERS, and | : |
| UNITED FARM WORKERS FOUNDATION, | : |

20-cv-10642 (LJL)

AMENDED ORDER

Plaintiffs,

-v-

UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY and ANDREW WHEELER,

Defendants.

------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:[1]

       Plaintiffs move for a temporary restraining order ("TRO") and a preliminary injunction

enjoining a regulation of the Environmental Protection Agency ("EPA"), scheduled to be

implemented on December 29, 2020, from going into effect.  Plaintiffs also move for a stay

pursuant to 5 U.S.C. § 705.  For the following reasons, the TRO is granted and the Court will

stay the effective date of the challenged rule, until January 12, 2021, pursuant to 5 U.S.C. § 705,

pending a hearing on the application for a preliminary injunction.

### A.  Statutory Background

---

[1] This opinion was originally issued on December 29, 2020.  The Court has issued this amended
opinion to reflect facts that the Government later provided to the Court in its letter dated January
15, 2021.  Dkt. No. 34.  The only changes to the opinion appear in fn. 4.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_ 12/29/2020 _

Congress passed the Federal Insecticide, Fungicide & Rodenticide Act ("FIFRA") in 1947. 7 U.S.C. § 136, *et seq.* "As first enacted, FIFRA was 'primarily a licensing and labeling statute.'" *N.Y. State Pesticide Coal., Inc. v. Jorling*, 874 F.2d 115, 117 (2d Cir. 1989) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 991 (1984)). The original version of FIFRA "primarily dealt with licensing and labeling." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 437 (2005). "Under the original version of FIFRA, all pesticides sold in interstate commerce had to be registered with the Secretary of Agriculture. The Secretary would register a pesticide if it complied with the statute's labeling standards and was determined to be efficacious and safe." *Id*.

In 1972, the statue was substantially revised through the adoption of the Federal Environmental Pesticide Control Act. 86 Stat. 973 ("FEPCA"). As amended by the FEPCA, FIFRA "was transformed from primarily a labeling law into a comprehensive scheme to regulate the use, sale and labeling, of pesticides-partly through EPA registration of the substances, including review, suspension and cancellation of registration." *Jorling*, 874 F.2d at 117. "As amended, FIFRA regulated the use, as well as the sale and labeling, of pesticides; regulated pesticides produced and sold in both intrastate and interstate commerce; provided for review, cancellation, and suspension of registration; and gave EPA greater enforcement authority." *Bates*, 544 U.S. at 437 (quoting *Ruckelshaus*, 467 U.S. at 991-92 (1984)).

FIFRA requires the EPA "[t]o the extent necessary to prevent unreasonable adverse effects on the environment . . . by regulation [to] limit the distribution, sale, or use in any State of any pesticide that is not registered under this subchapter." 7 U.S.C. § 136a. "Unreasonable adverse effects on the environment" are defined as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of

the use of any pesticide." *Id*. § 136(bb).

## B. Regulatory Background

Pursuant to its authority under FIFRA, the EPA has implemented measures to protect workers in two primary ways: (1) through specific use instructions and restrictions on pesticide product labeling; and (2) through the Agricultural Worker Protection Standard ("WPS").  80 Fed. Reg. 67,496, 67,500.

EPA adopted the WPS in 1974, after passage of the FEPCA, and revised the regulations in 1992 and 2015.  The WPS is a uniform set of requirements for farmworkers, pesticide handlers, and their respective employers.  Its purpose is "to expand protections against the risk of agricultural pesticides without making individual product labeling longer and much more complex." *Id*. at 67,500.  Its requirements are "generally applicable to all agricultural pesticides and are incorporated onto agricultural pesticide labels by reference." *Id*.  The WPS provides a comprehensive collection of pesticide management practices that apply to agricultural pesticide use in crop production. *Id*.  These requirements are "designed to reduce the risks of illness or injury resulting from workers' and handlers' occupational exposures to pesticides used in the production of agricultural plants on farms or in nurseries, greenhouses, and forests and also from the accidental exposure of workers and other persons to such pesticides."  40 C.F.R. § 170.1. The WPS's requirements are further intended "to reduce or eliminate exposure to pesticides and [to] establish[] procedures for responding to exposure-related emergencies." *Id*.

"Workers" protected by the WPS are individuals who are employed to "perform[] activities relating to the production of agricultural plants on an agricultural establishment . . ." 40 C.F.R. § 170.3.  "Handlers" are individuals employed "by an agricultural establishment or commercial pesticide handling establishment," who are, inter alia, "mixing, loading, transferring, or applying pesticides"; "[d]isposing of pesticides or pesticide containers"; "[h]andling opened

3

containers of pesticides"; "[a]cting as a flagger"; "[c]leaning, adjusting, handling, or repairing the parts of mixing, loading, or application equipment that may contain pesticide residues"; or "[a]ssisting with the application of pesticides." *Id.*

As revised in 1992, the WPS included two primary provisions for protection of nearby individuals during pesticide application: (1) a prohibition on allowing or directing any worker to enter or remain in a treated area; and (2) a general "do not contact" provision that stated that "[t]he handler employer and the handler shall assure that no pesticide is applied so as to contact, either directly or through drift, any worker or other person, other than an appropriately trained and equipped handler." 40 C.F.R. § 170.210(a).

## C.  The 2015 Regulation

When EPA promulgated the 1992 Rule, it estimated that approximately 10,000 to 20,000 incidents of physician-diagnosed pesticide poisonings occurred in the WPS-covered workforce annually.  That estimate was based on then-current data on occupational pesticide-related incidents.  80 Fed. Reg. at 67,502.

In the intervening years until 2015, EPA continued to seek "to ensure that the [WPS] provides the intended protections effectively and to identify necessary improvements." *Id*. at 67,499.  After meetings with diverse stakeholders, the EPA concluded that the protections of the WPS were not sufficient to ensure safety.  The EPA found that, despite the "do not contact" provisions, workers and bystanders continued to suffer contact with pesticides.  The EPA estimated that number of physician-diagnosed pesticide poisonings remained between 1,810 and 2,950 incidents annually, and that many of these exposures were avoidable.  *Id.* at 67,502.

One particular area of concern was spray drift, "the off-site movement through the air of pesticide droplets or particles originating from pesticides applied as liquids or dry materials." *Id.*

at 67,520.  Spray drift can create risk for workers and bystanders outside of a treated area when droplets or particles move outside the area being treated, during or after the pesticide application. *Id*.  The EPA found that "as much as 37% to 68% of acute pesticide-related illnesses in agricultural workers are caused by spray drift."  79 Fed. Reg. at 15,448; Compl. ¶ 32.  It found that another independent study examining 3,646 cases of acute pesticide illness determined that the most common contributing factor was exposure to off-target pesticide drift.  *Id*. at 15,448. The EPA also cited a study which found that 14-24% of total occupational pesticide poisoning could be attributed to off-target drift.  *Id*.  The study also found that over half of drift-related cases were non-occupational.  All of these studies were done in the period between 1992 and 2015, during which time the "do not contact" rule was in place.

Based on its conclusions that the existing protections of the WPS were insufficient to protect workers, handlers, and bystanders from exposure to pesticides, the EPA issued a proposed rule revising the WPA.  *Id*. at 15,450.  The EPA determined that there was "strong evidence that workers and handlers may be exposed to pesticides at levels that can cause adverse effects and that both the exposures and the risks can be substantially reduced" through more protective regulations.  *Id*. at 15,446.  The EPA concluded that "experiences such as those of workers having to move to get out of the way of the tractor that was applying pesticide . . . and workers being directly sprayed confirm EPA's position that additional protections are necessary during pesticide applications on farms and in forests."  80 Fed. Reg. at 67,522.

The proposed revisions to the WPS included a provision that would require a pesticide handler to suspend spraying if an individual came within a specified distance of the area that was being treated with pesticides.  *Id*.  The provision was intended to address the weaknesses and failings of the "do not contact" rule.  *Id*.

The EPA published the proposed rule for notice and comment.  Commenters raised logistical problems with the distance elements of the proposal.  In particular, commenters were concerned that a handler might not be able to see whether or not any person came near the treated area at all times during a pesticide application.  *Id.*  In response to these concerns, the EPA revised the requirements so that a handler was required to suspend application of pesticide only if a person came within a specified distance of the application equipment.  *Id.*  In the final rule, this area around the application equipment was designated the "application exclusion zone" ("AEZ").  The AEZ was "essentially a horizontal circle surrounding the application equipment that moves with the application equipment."  *Id.*  Handlers are required to "immediately suspend a pesticide application if any other worker or other person, other than an appropriately trained and equipped handler involved in the application, is in the application exclusion zone."  CFR § 170.505(b).

As set forth in the final rule, the size of the AEZ depended upon the method of pesticide application.  As finalized, the AEZ extended 100 feet horizontally from the application equipment when the pesticide is applied by: "(A) Aerially. (B) Air blast application. (C) As a spray using a spray quality (droplet spectrum) of smaller than medium (volume median diameter of less than 294 microns). (D) As a fumigant, smoke, mist, or fog."  *Id*. § 170.405(a)(1)(i-iii).  The AEZ would extend only 25 feet when spray quality was medium or larger (volume median diameter of 294 microns or greater).  *Id*.  The EPA concluded that this distinction was warranted by the fact that pesticide sprayed as larger droplets was less susceptible to drift.  80 Fed. Reg. at 67,523.

The EPA also concluded that the AEZ would extend beyond the boundaries of the agricultural establishment.  *Id*. at 67,524.  The EPA offered three reasons for doing this: First, it

6

would "address[] more of the worker drift cases, where workers are within 100 feet of the

agricultural establishment." *Id*.  The EPA noted that "[o]ut of 17 incidents identified in the

comments, only one would have been prevented if the application exclusion zone was limited to

the boundaries of the agricultural establishment as provided in the proposed rule." *Id*.  Second,

"the existing requirement that the handler must assure the pesticide is applied in a way that does

not contact workers or other persons already extends beyond the boundary of the agricultural

establishment." *Id*.  Finally, "the application exclusion zone would extend a maximum of 100

feet beyond the boundary of an agricultural establishment only for the length of time it takes for

the equipment applying the pesticide to pass by, so this should not shut down roads or access

points for long periods of time." *Id*.

During the comment period, some commenters objected to the AEZ provision on the

ground that the "do not contact" provision provided adequate protections for workers and

bystanders.  *Id*. at 67,520-21.  The EPA concluded that the "do not contact" provision—the

primary protection in the WPS for workers and bystanders outside of a treated area—was

insufficient to prevent people from being sprayed with pesticides.  It explained:

> EPA disagrees with the assertion that the "do not contact" requirements, along with
> the other protections on pesticide labels, are by themselves sufficient to protect
> workers and bystanders from being directly contacted by pesticides that are applied.
> First, many commenters cited incidents where people were directly exposed to
> pesticide applications, even if there was disagreement about how regularly these
> types of incidents happen.  Second, EPA's risk assessments and registration
> decisions are based on the premise that the WPS protections effectively prevent
> people (workers and bystanders) from being sprayed directly.  In other words,
> incidents where workers or bystanders are sprayed directly result in people being
> exposed to pesticides in a way that is not considered in EPA's risk assessments or
> registration decisions.

*Id*. at 67,521.

The AEZ provision went into full effect in January 2018.

**D. The 2020 Regulation**

On November 1, 2019, the EPA published a proposal to roll back provisions of 2015 Rule that related to the AEZ.  84 Fed. Reg. 58,666.  According to the EPA, it had solicited comments in the spring of 2017 on regulations that "may be appropriate for repeal, replacement or modification" in accordance with Executive Order 13777, Enforcing the Regulatory Reform Agenda.  *Id*. at 58,668.  Twenty-five commenters provided input on the AEZ provision pursuant to the Executive Order, including "USDA, State pesticide regulatory agencies, State organizations, an organization representing Tribal pesticide regulators, a local government advisory committee, an agricultural coalition, farm bureau federations, growers, grower organizations, farmworker advocacy organizations, a public health association, a retailer organization and private individuals."  *Id*.  Commenters raised concerns about "the ability of states to enforce the requirement, . . . a need for clarity about how the requirement was intended to work, . . . problems with worker housing near treated areas, and the perception of increased burden on the regulated community."  *Id*.  In response to comments received through the Regulatory Reform Agenda process, EPA solicited feedback on the AEZ requirements from the Pesticide Program Dialogue Committee ("PPDC").  In sum, according to the EPA, "[r]equests from SLAs [i.e. State Lead Agencies] to clarify and simplify WPS AEZ requirements, together with comments received through the Regulatory Reform Agenda process and input from the PPDC, prompted EPA's decision to develop this proposed rule."  *Id*.

The proposed rule made a number of revisions to the AEZ.  First, it limited the AEZ to the boundaries of the agricultural establishment on which the pesticides were being sprayed.  *Id*. at 58,668.  Second, it revised the provision requiring handlers to suspend application of pesticides when workers or other people were present in the AEZ to clarify that the application could be resumed once no workers or other person remained in the AEZ.  *Id.*  Third, the EPA

8

proposed to eliminate the requirement that the AEZ extend for 100 feet when pesticides with small droplet sizes are being sprayed, replacing it with an across-the-board AEZ of 25 feet for droplets of all sizes.  *Id.*  Fourth, the EPA proposed to amend the AEZ requirements to allow pesticide handlers to make or resume an application despite the presence of certain types of individuals within the treated area or AEZ:  (1) Appropriately trained and equipped handlers involved in the application; (2) Persons not employed by the establishment in an area subject to an easement that prevents the agricultural employer from temporarily excluding those persons from that area; and (3) Owners of the agricultural establishment and their immediate family members who remain inside closed buildings, housing, or shelters on the establishment.  *Id.*

The EPA received 126 comments on the proposed rollback.  110 opposed the changes, including plaintiffs in this action, while 16 commenters supported the changes.  Commenters supporting the rule noted "that [the] changes would result in improved enforceability and compliance while maintaining other protections intended the ensure the safety of workers or other persons from contact during pesticide applications."  85 Fed. Reg. at 68,765.

Some commenters opposing the rule objected that the EPA, in formulating the 2020 rule, had failed to justify the change in its position since it had promulgated the 2015 Rule.  *Id*. at 68,766.  "These commenters argued that the proposed rule rests on new conclusions based substantially on the same evidence the agency considered when reaching the opposite conclusions in 2015."  *Id.*  These commenters further argued that it was arbitrary and capricious for the EPA "to limit the AEZ without new evidence just five years after establishing the AEZ with no explanation of why EPA's assessment of those facts in 2015 was incorrect."  *Id*.  Commenters also challenged the EPA's reliance on feedback solicited and received in three venues: (1) Training and outreach to state pesticide regulatory agencies; (2) as part of EPA's

"Regulatory Reform Agenda" efforts in 2017; and (3) two meetings of the Pesticide Program Dialogue Committee ("PPDC") in 2017.  *Id.*

The EPA responded that the AEZ provisions were being altered because they were unworkable and difficult to administer.  *Id.*  It asserted that it had received comments from state regulatory authorities reflecting concerns about the AEZ's complexity and its enforceability, and "that it would be difficult for states to provide compliance assistance in the absence of clear guidance from the Agency."  *Id.*

The EPA pointed to two guidance documents it had issued to attempt to clarify the AEZ provision.  The first, issued in April 2016, had indicated that pesticide applications that had been suspended due to the presence of people in the AEZ could resume once a handler had taken measures to ensure that those individuals would not be contacted by the spray.  *Id.* at 68,766-67. The EPA continued to hear from state regulatory agencies about enforcement challenges and complexity of the AEZ provision.  *Id.* at 68,767.  In February 2018, the EPA issued new guidance which "addressed the off-establishment AEZ by explaining what steps to take when someone enters the AEZ that is located off the establishment, when and under what circumstances handlers can resume pesticide applications that have been suspended, as well as providing more detail about how to evaluate situations and what measures can be taken when people are within the AEZ but off the establishment."  *Id.*  The new guidance indicated that, when a person who is located off the establishment enters the AEZ, the handler's responsibility is to suspend the application of the pesticide, to evaluate the situation to determine if she can resume the application without contacting anyone, and only then to resume.  The guidance also indicated that a handler could resume pesticide application even if people beyond the boundary of the agricultural establishment were within the AEZ, so long as the handler could "ensure that

the pesticide will not contact any persons that are in this portion of the AEZ area." *Id*.

Environmental Protection Agency, Agricultural Worker Protection Standard (WPS) Application

Exclusion Zone (AEZ) Requirements Fact Sheet (Feb. 15, 2018) at 3-4.  The EPA continued to

hear from state regulators who were concerned that the guidance conflicted with the text of the

regulation itself, and that they would be "on shaky ground were we to ignore the plain language

of the Standard and regulate based on interpretative guidance."  85 Fed. Reg. at 68,767.  The

EPA thus responded that the revised regulations were necessary in order to clarify the scope of

the AEZ provision.  *Id*. at 68,769 ("Despite EPA's best efforts to offer clarity and a workable

solution through guidance, incongruity remains between EPA's interpretation of the "suspend"

requirement as a temporary measure until handlers take appropriate steps and how others may

interpret the language at 40 C.F.R. 170.505(b) to mean something more strict or permanent.").

Other commenters, including Plaintiffs, provided evidence that pesticide exposures were

continuing to occur, including first-hand accounts of bystanders and farmworkers being sprayed

and, in some case, experiencing serious health impacts.  *Id*. at 68,769.  Commenters including

Plaintiffs also submitted evidence that the AEZ should be expanded, rather than eliminated,

because its current radius was not sufficient to protect workers from drift.  Commenters asserted

that the EPA had correctly concluded in 2015 that the "do not contact" provisions were not

sufficient to protect safety and that the AEZ provision should be maintained.  *Id*. at 68,768-69.

According to the commenters, the role of the AEZ was to "proactively protect[] against pesticide

poisoning by requiring the suspension of application *before* anyone is sprayed while in contrast

the "Do Not Contact" provision can be enforced only after contact with pesticides has occurred."

*Id.* at 68,768.  Commenters pointed to two separate incidents in California where fieldworkers on

a farm sought medical treatment after exposure to pesticides during an application that took place

less than 100 feet away on a neighboring farm.  *Id.* at 68,768.  In both cases, California, which has state law requirements mirroring those of the 2015 Rule, issued administrative civil penalties for the spray.  *Id.*

In response to the concerns of the objecting commenters, the EPA justified its changes to the AEZ on the ground that the "do not contact" rules, coupled with new training requirements imposed by the 2015 Rule, were sufficient to protect workers and bystanders from pesticide spray.  *Id.* at 68,764-65.  According to the EPA, bystanders would still be protected by the "do not contact" provision of the WPS, because "[i]f a handler has any reason to believe that workers or bystanders may be contacted by a pesticide during a pesticide application, the application should not take place until either those individuals leave the area or the handler can take measures to ensure that contact will not occur."  *Id.* at 68,765.  As a result, the EPA concluded that "the AEZ imposes burdens that are disproportionate to the need for the extra measure of assurance the AEZ is intended to provide."  *Id.* at 68,768.

According to the EPA, the comments regarding the preventative benefits of the AEZ provision reflected "a misplaced emphasis on creating easily proven violations, irrespective of adverse effects."  *Id.* at 68,769.  The EPA stated that it "is not aware of any AEZ violation having been enforced without pesticide without contact [sic] occurring first, such as the two cases in California."  *Id.* at 68,770.  This fact, the EPA reasoned, provided further support for the proposition that the "do not contact" provision was sufficient to provide worker safety.  *Id.*

The Final Rule is scheduled to take effect December 29, 2020.

### E. The Instant Litigation

Petitioners filed suit challenging three aspects of the Final Rule, alleging that the EPA arbitrarily and capriciously promulgated them in violation of FIFRA.  First, they challenge the

roll back of the provision of the 2015 Rule that requires the AEZ to apply off the property (the "Boundary Provision").  Second, they challenge the Final Rule's exception to the AEZ for individuals who are not employees of the agricultural establishment and who are on an easement on the property (the "Easement Provision").  Third, they challenge the roll back of the aspect of the AEZ provision which mandates a 100-foot AEZ for pesticides sprayed in the form of small droplets which are more susceptible to drift (the "Droplet Provision").

### F. The Parties

Plaintiffs are a group of non-profit and membership organizations each of which provides services for, and advocates on behalf of, farmworking communities including in the areas of education, healthcare, safety training, leadership development, labor organizing, immigration and legal support, and policy advocacy.  Dkt. No. 1 ("Compl.") ¶¶ 10-19.  The organizations vary in the geographical territory in which they provide services and in their particular missions.  Each of the Plaintiffs, however, represents or provides services for farmworkers, and each is dedicated, in part, to improving farmworker working and living conditions.  Several of the Plaintiff organizations have a particular focus on preventing the harms caused by pesticide exposure.

RMM is a New York State non-profit organization that serves rural migrant communities by supporting farmworkers that are advocating to improve their own working and living conditions and administering educational programs for farmworkers and rural children.  *See* Compl. ¶ 10; Witt Decl. ¶¶ 2-3.  Alianza is a national non-profit farmworker organization, composed of 15 member organizations, that supports the development of leadership among farmworking women through national organizing, public education and outreach, and federal policy-advocacy.  *See* Compl. ¶ 11; Trevino-Sauceda Decl. ¶ 2.  CATA is a non-profit farmworker organization operating in parts of New Jersey, Pennsylvania, and Maryland

13

dedicated to improving workers' rights, workplace health and safety, immigrants' rights, and food justice. Compl. ¶ 12; Cully Decl. ¶¶ 1-2. Among other things, CATA provides safety training to farmworkers, including about pesticide safety practices. Cully Decl. ¶¶ 5-6. FWAF is a non-profit organization based in Florida that conducts programs and activities to support the development of leadership and activism among low-income communities of color that are disproportionately affected, among other things, by pesticide exposure and health issues. Compl. ¶ 13. MCN is a national non-profit organization with more than 10,000 constituent clinicians who work in community health centers and other health care delivery sites to provide healthcare for migrants, including farmworkers and those who live near farms. Compl. ¶ 14. "MCN's overarching goal is to improve the quality of health care and increase access to care for immigrants and other underserved populations." Liebman Decl. ¶ 4. Among MCNs services is "clinician training to help clinicians recognize and identify illnesses resulting from exposure to pesticides." Id. ¶ 5. PCUN is a farmworker union in Oregon whose "mission is to empower farmworkers to recognize and take action against systematic exploitation and all of its effects," Compl. ¶ 15; its programs include an initiative to combat harms caused by exposure to pesticides, including through policy advocacy and litigation, Lopez Decl. ¶ 3, 6, 8. Rural Coalition is a non-profit that advocates for farmers, ranchers, farmworkers, and rural communities through policy advocacy, litigation, and direct services. Compl. ¶ 16; Picciano Decl. ¶ 6. "The Rural Coalition's farmworker member group represent workers whose work is largely concentrated in the harvest of fresh fruits and vegetables" that are often treated with "massive amounts of pesticides." Id. ¶ 7. UFW is a national farmworker union with a membership of over 45,000 that engages in labor organizing and policy advocacy. Compl. ¶ 17; Romero Decl. ¶ 2-5. UFW Foundation is a sister organization to UFW. It serves over 100,000

farmworkers and low-income community members in California and Arizona and engages in policy advocacy, immigration and legal representation, worker education and outreach initiatives, and other direct services.  Fernandez Decl. ¶ 1-4.

Each of the Plaintiff organizations serves workers on farms where pesticides are sprayed. Several declarations filed in support of the instant motion contain testimony indicating a high prevalence of pesticide exposure among farmworkers and residents in agricultural communities—including among Plaintiffs' members—and the harmful effects that result from such exposure.  For example, CATA "estimate[s] that about 30% of the workers [it] visits experience some symptoms related to pesticide exposure—generally ranging from nausea, headaches and skin rashes to occasional more severe symptoms," including "cancer and prolonged medical disability."  Culley Decl. ¶ 6, 11.  Others also regularly report exposures that occur from pesticide drift.  *See* Lopez Decl. ¶ 5. ("Many of PCUN's members have experienced the effects of exposure to pesticides.  These symptoms include headaches, dizziness, fatigue, sleeplessness, nausea, and vomiting."); Picciano Decl. ¶ 8 ("[w]e have heard of workers who were directly sprayed with agricultural chemicals and suffered severe illness as a result, including kidney disease and other serious diseases that affect them their entire lives and can render workers unable to work. Our members also regularly report exposures that occur from pesticide drift.").

Plaintiffs' declarations attest that while the effects from exposure vary, they are sometimes devastating.  For example, Mily Revino-Sauceda, the co-founder and Executive Director of Alianza, declared:

> [O]ne Florida farmworker woman suffered life-long injuries as a result of her pesticide exposure, ultimately losing her sight and experiencing severe kidney failure. She is now blind and on dialysis, her physical movements are severely limited, and she frequently suffers from headaches and dizziness. We have heard

> similar stories from women in different parts of the country including California, Arizona, New York, and Maryland. Some of these women were exposed to pesticides while they were pregnant and suffered miscarriages as a result of the exposure, or severe pregnancy complications. The vast majority of farmworker women who have been subject to pesticide exposure, were exposed to these pesticides through off-target pesticide drift. Too many members have experienced short term effects such as eye and skin irritation, rashes, blisters, headaches, nausea, dizziness and fatigue; as well as long-term effects, including cancers, brain and nervous system damage, damage to lungs, liver, kidneys, and other internal organs, miscarriages, birth defects, infertility, or permanent loss of senses. Many of these women received no notice that pesticides were being administered to the surrounding area before the exposures occurred.

Trevino-Sauceda Decl. ¶ 11.

> Jessica Culley, General Coordinator for CATA, described an incident in which:

> a CATA member was exposed to pesticide drift from a tractor that was spraying chemicals from a distance of around 100 feet.  As a result of the exposure, the worker developed severe skin rashes, open skin wounds, diarrhea and nausea that lasted weeks after the initial exposure.  The worker is now permanently disabled due to illness developed as a result of the incident."

Cully Decl. ¶ 12

Although farmworkers themselves may be most often affected by pesticide exposure, the record also reflects that the families of farmworkers including their children, and other non-farmworking members of agriculture communities may be at risk.  *See* Trevino-Sauceda Decl. ¶ 10 ("Farmworkers living on the farm establishment or property bordering the farm establishment have consistently raised the issue of off-target pesticide drift . . . farmworkers women have communicated that pesticide from off-target drift has landed on their homes, personal items and clothing, and, in many instances, directly onto them and their children"); Lopez Decl. ¶ 5 ("[M]any PCUN members live very close to areas where pesticides are applied.  As a result, those members—along with their children—are threatened by exposure to dangerous pesticides even when they are not at work, because pesticides drift from fields to their homes.  Some

farmworker housing is only a few feet from fields where pesticides are sprayed, and people can

be exposed to pesticides even when they are indoors.").  For example, one declarant attested:

> I know of two schools in Woodburn, Oregon that are located very close to agricultural fields.  On numerous occasions, I have seen pesticides being applied to those fields.  PCUN's members with children at these schools are afraid that their children will be exposed to pesticide drift while playing outside at recess.  Having seen how close the pesticide spray comes to the schools, I am also concerned about the safety of these children, especially with pesticides like chlorpyrifos that harm children's brains.

Lopez Decl. ¶ 7.  That is in part because pesticide spray can drift from the field for which it is

intended to neighboring properties.  For example, Eriberto Fernandez, the Strategic Campaigns

Coordinator for the UFW Foundation, explained:

> As part of my job, I have witnessed heartbreaking incidents of workers who have developed illnesses with long term consequences from their exposure to pesticides, some of which were caused by spray from pesticide application that drifted across farm property boundary lines . . . In particular, in May 2017 an orchard in Bakersfield, California was spraying its crops with pesticides. The pesticide spray drifted into an adjacent field where several UFW Foundation members were working. The UFW Foundation members in the adjacent cabbage field exposed to the pesticides spray experienced severe eye and skin irritation, nausea, vomiting, and numbing of the mouth and tongue. Several of the workers had to receive emergency medical treatment to relieve them of the conditions they experienced as a result of the exposure to the pesticides.  On another occasion in 2018, I arrived at the scene of a pesticide exposure incident near Bakersfield, CA. When I drove up to the field, the paramedics had already stripped all the workers of their clothes. I saw workers with horrible skin rashes. I later learned that the cause of the pesticide exposure was aerial drift from pesticide spray from a nearby field which had just been treated with pesticides.

Fernandez Decl. ¶¶ 11-13.

## PROCEDURAL HISTORY

Plaintiffs initiated this action by a complaint filed on December 16, 2020.  The case was

filed as related to *New York v. Environmental Protection Agency*, 20-cv-10645 (S.D.N.Y.), an

action filed on the same day, also challenging the Final Rule, brought by five States and several

of the instant plaintiffs.  On December 18, 2020, Plaintiffs filed a proposed order to show cause

17

why the Final Rule should not be enjoined or stayed, Dkt. No. 14, along with a memorandum of law arguing that either a preliminary injunction or a TRO was appropriate, as well as declarations in support of the motion, Dkt. Nos. 15-25.  The same day, the Court ordered the Government to show cause, by December 22, 2020, why Plaintiffs should not be granted a TRO and/or preliminary injunction.  Dkt. No. 26.  The Government filed a brief opposing injunctive relief on December 22, 2020.  The Court held oral argument on Plaintiffs' motion on December 23, 2020.  At argument, the Court noted the expedited nature of the proceeding and made clear that the only application it was considering was for temporary relief, and not for a preliminary injunction.

## LEGAL STANDARD

The standards for a temporary restraining order are identical to those for a preliminary injunction, although the record for a temporary restraining order and the Court's conclusions are necessarily more preliminary.  In order to obtain a preliminary injunction or a TRO, the plaintiffs must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  When the injunction would affect government action taken pursuant to a regulatory scheme, the plaintiff must show a "clear or substantial" likelihood of success on the merits.  *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007).  "A showing of irreparable harm is 'the single most important prerequisite for the issuance of the preliminary injunction.'"  *New York v. U.S. Dep't of Educ.*, 2020 WL 4581595, at *5 (S.D.N.Y. Aug. 9, 2020) (quoting *Faively Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)).  The standard for a stay under 5 U.S.C. § 705 is the same as or similar to the standard for a preliminary

injunction.  *See Bauer v. DeVos*, 325 F. Supp. 3d 74, 104-05 (D.D.C. 2018).  As the Second

Circuit put it years ago, a "stay of an order of an administrative agency may be granted when the

following conditions are met: (a) Where the petitioner is likely to prevail on the merits of its

appeal; (b) Where the petitioner has shown that without a stay it will suffer irreparable injury; (c)

Where there is no substantial harm to other interested persons; and (d) Where the public interest

will not be harmed."  *E. Air Lines v. Civil Aeronautics Bd.*, 261 F.2d 830, 830 (2d Cir. 1958)

(citing *Va. Petroleum Jobbers Assoc. v. Fed. Power Comm'n*, 259 F.2d 921 (D.C. Cir. 1958)).

The Court need not decide whether the appropriate standard is clear or substantial likelihood of

success for a preliminary injunction or the likelihood of success as articulated by *Eastern Air

Lines*.  Plaintiffs' showing satisfies both standards at this stage.

## DISCUSSION

### A. Standing

"Article III of the Constitution limits federal courts to deciding 'Cases' and

'Controversies.'  For a legal dispute to qualify as a genuine case or controversy, at least one

plaintiff must have standing to sue."  *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565, 204 L.

Ed. 2d 978 (2019); *see* U.S. Const. art. III, § 2.  To have standing, a plaintiff must "present an

injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's

challenged behavior; and likely to be redressed by a favorable ruling."  *Davis v. Fed. Elec.

Comm'n*, 554 U.S. 724, 733 (2008); *see also New York v. Dep't of Homeland Sec.*, 969 F.3d 42,

59 (2d Cir. 2020) ("'to establish standing for a preliminary injunction, a plaintiff cannot rest on .

. . mere allegations . . . but must set forth by affidavit or other evidence specific facts' that

establish the 'three familiar elements of standing: injury in fact, causation, and redressability.'")

(quoting *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011)).  "[F]uture injuries . . .

'may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Id*. (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

There are two ways for an organization to establish standing: (1) as a representative of its members, or (2) on its own behalf.  *See Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 415-16 (S.D.N.Y. 2012).

"An association has standing to bring suit on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.* (quoting *Disability Advocs., Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 157 (2d Cir.2012)).  "The first two of these requirements are constitutional in nature; the third is 'prudential' and 'best seen as focusing on . . . matters of administrative convenience and efficiency.'" *Id.* (quoting *All. for Open Soc'y Int'l, Inc. v. USAID*, 651 F.3d 218, 229 (2d Cir.2011)).

To establish standing to sue on its own behalf, an organization must establish that absent relief, it will be forced "to divert money from its other current activities to advance its established organizational interests[.]" *Centro de la Comunidad Hispana de Locust Valley v. Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017); *see also Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011).  "[O]nly a perceptible impairment of an organization's activities is necessary for there to be injury-in-fact." *Nnebe*, 644 F.3d at 156; *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  This Circuit has held that organizational plaintiffs challenging an agency rule can meet this standard where they are "dedicated to providing an array of legal and social services" and, in response to a proposed federal rule they are forced to "expend[] significant

20

resources to mitigate the [r]ule's impact on those they serve," because such expenditures require a "diver[sion of] resources that would otherwise have been available for other programming." *Homeland Sec.*, 969 F.3d at 61.

Based on the papers before the Court, at least two plaintiffs, UFW and RMM, have established standing—the former as a representative and the latter on its own behalf.  Because "[i]t is well settled that where, as here, multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement,'" *Oyster Bay*, 868 F.3d at 109 (quoting *Rumsfeld v. Forum of Acad. and Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)), and because the issue of standing has not been fully briefed or argued by the parties, the Court at this stage declines to evaluate whether the other named plaintiffs have standing under either applicable theory.

UFW is a union with a "total membership of over 45,000" farmworkers.  Romero Decl. ¶ 2.[2]  As discussed in the Irreparable Harm section *infra*, implementation of the final rule will create a "substantial risk" that Plaintiffs' members will be exposed to harm, *see Davis*, 554 U.S. at 733, meaning that its members would have standing to sue in their own right.  The interests it is seeking to protect are germane to the organization's purpose, which is, in part, to "advocat[e] for policies to protect farmworkers, especially regulations restricting the use of and exposure to pesticides because of the extreme toxicity of these chemicals."  Romero Decl. ¶ 5.  Finally, "neither the claims asserted nor the relief requested require the participation of individual members . . . as the complaint seeks . . . injunctive relief rather than damages.  *Bloomberg*, 290

---

[2] Because the declarations are not challenged and the Government has not yet had discovery, the Court accepts the averments of the declarations as true for purposes of this motion.

F.R.D. at 416.  Thus, UFW is an association that has standing to challenge the Final Rule on behalf of its members.

RMM, in turn, has established standing to sue on its own behalf.  RMM is "a statewide, non-profit organization founded in 1981 that advocates for, and works closely with, rural and migrant communities" by advocating for and providing education and empowerment programs to farmworkers and rural youth.  Witt Decl. ¶¶ 2-3.  RMM's Executive Director declared that the Final Rule will "cause RMM to divert time and money away from the other programs [it] offers to provide training and education on the new rule," including outreach to farmworkers and to "schools, churches, and other community spaces that are located nearby agricultural establishments and that face an increased risk of pesticide drift exposure under the new rule."  *Id.* ¶ 7.  Moreover, because of the COVID-19 pandemic, in order to implement such outreach, RMM will "have to increase [its] online offerings, which requires money and resources to expand [its] technology and make sure the farmworkers have the technology needed to participate, including sourcing and providing laptops to them."  *Id.* ¶ 8.  Defendants have not disputed this evidence or argued that it is insufficient to establish that RMM has standing to sue on its own behalf.  Thus, while it is a sufficient under Article III that UFW has standing to sue as representatives of their members, the Court also holds that at least RMM has standing to sue on its own behalf because the Final Rule will cause it to "divert money from its other current activities to advance its established organizational interests[.]"  *Oyster Bay*, 868 F.3d at 110; *see Homeland Sec.*, 969 F.3d at 61.

**B.  Likelihood of Success on the Merits of FIFRA Claim**

In order for a petitioner to receive a preliminary injunction or TRO against government action taken in the public interest pursuant to a statutory or regulatory scheme, the party must show a "clear or substantial likelihood of success on the merits."  *Stagg P.C. v. U.S. Dep't of*

*State*, 158 F. Supp. 3d 203, 208 (S.D.N.Y. 2016) (quoting *Sussman*, 488 F.3d at 140)).

FIFRA provides its own judicial review provision.  *See* 7 U.S.C. § 136n.  Under that provision, "final actions of the [EPA] Administrator not committed to the discretion of the Administrator by law are judicially reviewable by the district courts of the United States."  *Id*. Because FIFRA provides its own mechanism for judicial review, the cause of action for challenging agency actions under FIFRA does not arise under the APA.  *See Defs. of Wildlife v. Adm'r*, 882 F.2d 1294, 1303 (8th Cir. 1989).  However, final actions of the Administrator under FIFRA are evaluated under the same standards of review provided in the APA.  *See Friends of Animals v. U.S. Env't Prot. Agency*, 383 F. Supp. 3d 1112, 1120 (D. Or. 2019).

Under the Administrative Procedure Act ("APA"), a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The Court's scope of review under the deferential "arbitrary and capricious standard" is "narrow."  *Dep't of Com.*, 139 S.Ct. at 2569 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (internal quotation marks omitted).  Agency action is arbitrary and capricious when it fails to "examine the relevant data and articulate a satisfactory explanation for its action" or when it has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43-44.  The Court thus "determine[s] only whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'"  *Dep't of Com.*, 139 S.Ct. at 2569 (quoting *State Farm*, 463 U.S. at 43)).  The Court may not substitute

its judgment for that of the agency, *id.*, but must confine itself to determining whether the agency

has engaged in "reasoned decisionmaking," *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522

U.S. 359, 374 (1998); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("[T]he orderly

functioning of the process of review requires that the grounds upon which the administrative

agency acted be clearly disclosed and adequately sustained.").

"Agencies are free to change their existing policies as long as they provide a reasoned

explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125 (2016);

*see also Nat. Cable & Telecom. Ass'n v. Brand X Internet Serv.*, 545 U.S. 967, 981-82 (2005).

When an agency changes prior policy, the agency need not demonstrate "that the reasons for the

new policy are *better* than the reasons for the old one; it suffices that the new policy is

permissible under the statute, that there are good reasons for it, and that the agency *believes* it to

be better, which the conscious change of course adequately indicates." *FCC v. Fox Television

Stations, Inc.*, 556 U.S. 502 (2008). Still, Congressional legislation is not a blank check upon

which each succeeding administration can write its policy preferences without regard to the

evidence before the agency, the factual findings upon which the agency based its prior policy, or

the dictates of reason. *See generally*, *State Farm*, 463 U.S. at 43. For example, when an agency

rescinds a prior regulation, "such action requires 'a reasoned analysis for the change beyond that

which may be required when an agency does not act in the first instance.'" *Fox*, 556 U.S. at 514

(quoting *State Farm*, 463 U.S. at 42). When changing course, the agency must "show that there

are good reasons for the new policy," and "display awareness that it *is* changing position." *Fox*,

556 U.S. at 515. Moreover, an agency must "provide a more detailed justification than what

would suffice for a new policy created on a blank slate . . . when, for example, its new policy

rests upon factual findings that contradict those which underlay its prior policy." *Id.* "It would

be arbitrary and capricious to ignore such matters." *Id.* In addition, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515-16. "[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars*, 136 S. Ct. at 2126.

In reviewing agency action, "a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Com.*, 139 S.Ct. at 2573 (citing *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 549 (1978)). "[A] court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Id.* Relatedly, "a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Id.* However, the explanation the agency provides in litigation for its action must be congruent with "what the record reveals about the agency's priorities and decisionmaking process." *Id.* at 2575. An agency cannot adopt a different rationale to justify its decisionmaking for the purposes of litigation, *id.*, nor can a Court find an agency's rulemaking to have been arbitrary and capricious on the assumption that the agency acted for different reasons than those reflected in the administrative record, *id.* at 2573.

On the current record, Petitioners have shown a substantial likelihood of success on the merits on their claim that the EPA violated FIFRA's procedural requirements in promulgating the challenged portions of the Final Rule. The justifications for those portions of the Final Rule proffered by the EPA do not satisfy the requirement that the agency "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the

facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotations marks and citation omitted).  Moreover, for each of the three proposed changes to the AEZ provision that Petitioners challenge, the EPA bases the Final Rule on factual findings that contradict those which underlay the EPA's prior policy, and EPA has neither provided a reasoned explanation for disregarding the facts which undergirded EPA's prior policy nor provide the requisite more detailed justification necessary under *Fox*.

The EPA has not adequately supported the Boundary Provision of the Final Rule.  The EPA justified limiting the AEZ to the boundaries of an agricultural establishment based principally on what it stated were difficulties in enforcing the 2015 Rule.[3]  The agency undoubtedly was "permitted to consider costs and benefits as well as enforcement issues when establishing rules and regulations."  *Cellular Phone Taskforce v. F.C.C.*, 205 F.3d 82, 92 (2d Cir. 2000).  However, the agency's discussion of enforcement difficulties does not reflect that the agency made an independent judgment after examining the relevant data.  *See Dep't of Com.*, 139 S.Ct. at 2569.  Indeed, the agency did not articulate any particular enforcement difficulties that the State Lead Agencies ("SLAs")—state pesticide regulatory agencies—had found that it credited and adopted.  Rather, the agency merely reported that the SLAs had stated that there were enforcement difficulties and then—based upon those assertions alone—stated that those purported enforcement difficulties provided sufficient justification for revising the 2015 Rule.

There are two flaws with that approach, each of which render the challenged provisions in the Final Rule arbitrary and capricious.  First, as the Government conceded at argument, it is not sufficient for an agency in adopting a regulation simply to mouth the views of one or another

---

[3] At oral argument, the EPA conceded that the Final Rule collapsed the distinction between difficulties of regulatory enforcement and difficulties of compliance for regulated parties.  The Court addresses both concerns.

of the affected parties—whether an entity that will be regulated or a beneficiary of the regulation.

The requirement that the agency "examine the relevant data and articulate a satisfactory

explanation for its action including a 'rational connection between the facts found and the choice

made,'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S.

156, 168 (1962)), implies that the agency is required actually to examine the relevant data and

reach a reasoned conclusion about the need for regulation and its consistency with law.

*Appalachian Power Co. v. E.P.A*, 249 F.3d 1032, 1059 (D.C. Cir. 2001) ("There is no doubt that

the EPA is required to examine the relevant data and articulate a sufficiently reasoned

explanation for its action.").  The agency here abdicated that responsibility.  *See, e.g.*, *District*

*Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56-57 (D.C. Cir. 2015) (holding that an agency

failed to comply with the APA where it failed to examine data to determine whether or not it was

erroneous).

Second, given the prior need for the AEZ regulation found by the agency, the EPA was

required "[a]t the very least" to consider whether there was an "alternative way of achieving the

objectives of [FIFRA]."  *State Farm*, 463 U.S. at 48.  It need not have made clear "why the new

rule effectuates the statute as well as or better than the old rule."  *Fox*, 556 U.S. at 514 (internal

quotation marks and citation omitted).  But, it must engaged in reasoned decisionmaking.  In the

absence of any articulation of an actual or expected regulatory enforcement challenge and what

that challenge was, the administrative record before the Court is devoid of any "cogent[]"

explanation for why the agency "has exercised its discretion in a given manner."  *State Farm*,

463 U.S. at 48.  Because the provision limiting the AEZ to the boundaries of the property was

supported only by the bare assertion that SLAs indicated it would be difficult to enforce without

identifying those enforcement challenges, the EPA has not shown a reasoned connection

between its decision and the objectives of FIFRA.  The agency's failure to do so leaves the Court with no ability to determine whether an "alternative way of achieving the objectives of [FIFRA]" might have been available to the EPA.  *Id.*

The inadequacy of the EPA's discussion of enforcement challenges is not the only defect in the agency's justification for the Boundary Provision.  In response to concerns raised by commenters that the AEZ provision was a necessary supplement to protect worker and bystander safety, the EPA responded that the AEZ was "redundant," in light of the "do not contact" provision.  85 Fed. Reg. at 68,768.  The EPA stated that it was unnecessary to apply the AEZ beyond the boundaries of a property, because bystanders would still be protected by the "do not contact" requirement.  *Id.* at 68,765.  Because the "do not contact" provision would remain in place, limiting the application of the AEZ to the property would not "result in protections being weakened."  *Id.* at 68,773.

In so concluding, however, the agency failed to provide any "reasoned explanation for disregarding [the] facts and circumstances that underly or were engendered by the [EPA's] prior policy."  *Fox*, 556 U.S. at 515-15.  The EPA previously had found that the "do not contact" requirements were not sufficient to protect individuals off of the agricultural establishment from the danger of pesticide drift.  *See* 2015 Rule at 67,251 ("EPA disagrees with the assertion that the 'do not contact' requirements, along with the other protections on pesticide labels, are by themselves sufficient to protect workers and bystanders from being directly contacted by pesticides that are applied.").  The "do not contact" requirement—which predated the 2015 Rule—could not protect against unintended drift.  As the studies the EPA previously credited and relied upon showed, even when the "do not contact" rule was in place, there were between 1,810 and 2,950 annual incidents of physician-diagnosed pesticide poisoning, and that spray drift

accounted for as much as 37% to 67% of acute pesticide-related illnesses.  According to the

EPA, many commenters had cited incidents where people were directly exposed to pesticide

applications in spite of the "do not contact" rule.  Because such incidents had continued to occur,

"there was a need to supplement the existing WPS protections to reduce exposures to workers

and other persons from being directly sprayed with pesticides."  2015 Rule at 67,521.  The AEZ

provision was not redundant; it was "intended to supplement the existing 'do not contact'

requirement by giving the applicator specific criteria for suspending application."  *Id*. at 67,524.

At argument, the Government relied on provisions in the 2015 Rule that mandated

enhanced handler training as a justification for the changes effected by the Final Rule.[4]  The

Final Rule states that "The Agency believes that the enhanced training requirements of the 2015

WPS should substantially increase compliance with the 'Do Not Contact' requirement."  85 Fed.

Reg. at 68,768.  The Government's argument has not overcome the strength of Plaintiffs'

showing, at least at this stage of the proceedings.  Although the enhanced training was contained

in the 2015 Rule itself, the EPA in 2015 still determined that the AEZ was a necessary protection

in addition to "do not contact."  That reflects a judgment that enhanced training—without the

AEZ—was not sufficient, by itself, to address the documented instances of workers being

---

[4] After this opinion was originally issued, the Government alerted the Court to a possible error in
the rationale underlying the Final Rule.  Both in the notice of proposed rulemaking, 85 Fed. Reg.
68,760 (Oct. 30, 2020) and before this Court, the Government had maintained that all trainings
approved by the EPA since 2018 have "incorporated EPA's 2016 guidance on how to apply
pesticides near establishment borders and provide information on various measures applicators
or handlers can take to prevent individuals from being contacted by spray or through drift."  85
Fed Reg. at 68,770-71.  In its letter, the Government informed the Court that this was in error:
"After evaluating the issue, EPA has determined that a number of trainings it has approved since
2018 do not contain the complete set of topics regarding pesticide applications near the borders
of an establishment and on measures that can be used to prevent contact through drift . . ."  Dkt.
No. 34 at 1.  Accordingly, the EPA "withdr[ew] any reliance on this mistaken understanding of
the content of EPA-approved trainings since 2018, and on the affected sections of the preamble
to the 2020 Rule, in its justification for the 2020 Rule and in its papers in this Court."  *Id*. at 2.

exposed to pesticide drift even in the presence of the "do not contact" rule.  This judgment by EPA is consistent with the rationale for the AEZ in the 2015 Rule that the handler's discretion alone—irrespective of training—had not proved adequate to prevent the persistent incidences of pesticide poisoning.  *See* 80 Fed. Reg. at 67,521 ("EPA disagrees with the assertion that the 'do not contact' requirements, along with the other protections on pesticide labels, are by themselves sufficient to protect workers and bystanders from being directly contacted by pesticides that are applied.").  The AEZ creates a bright-line rule that obviates (or at least dramatically reduces) exercise of handlers' discretion within a zone that EPA adjudged to be inherently dangerous.[5]

The Court assumes that the EPA was free to reach a different judgment and to conclude—contrary to the expectations of the 2015 Rule—that the enhanced training mandated by the 2015 Rule would prevent the documented instances of pesticide poisoning, or that even if the training did not prevent the pesticide poisoning, the costs of the AEZ outweighed the benefits it provided in increased worker safety.  But, as the Government conceded at argument, that is not what the EPA did.  It concluded that the addition of the AEZ provision as drafted in the 2015 Rule did not provide any benefits to farmworkers—that it was "redundant"—and that therefore its elimination would not impose any costs on farmworkers or on those who might be the victims of unintended drift.  And it reached that conclusion without challenging the accuracy of the findings upon which the 2015 Rule rested or their continued viability after the adoption of that Rule.  It justified agency action not on any new balancing of the costs and benefits, but on the conclusion that there would be no costs to curtailing the old rule while also concluding that

---

[5] *See id*. at 67,524 ("The new, explicit requirement to suspend application if people other than handlers are in the application exclusion zone is intended to supplement the existing 'do not contact' requirement by giving the applicator specific criteria for suspending application. These specific criteria should be equally useful to applicators attempting to comply with the existing 'do not contact' requirement beyond the boundaries of the agricultural establishment . . . .")

"revising the AEZ requirement is not expected to result in any quantifiable cost savings for farms covered by the WPS." 80 Fed. Reg. 68,769.  Before concluding that the AEZ provisions that the Final Rule would eliminate are of no benefit, the Agency was required to provide some reasoned explanation for why the results on which it relied in 2015 were no longer valid in 2020, or why a countervailing consideration carried greater weight.  On the record before the Court, it failed to do so.  The Plaintiffs thus have made a showing that the Agency acted arbitrarily and capriciously.  *See State Farm*, 463 U.S. at 43 (holding agency action arbitrary and capricious where the agency "offer[s] an explanation for its decision that runs counter to the evidence before the agency."); *Encino Motorcars*, 136 S. Ct. at 2126 ("[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.").

The EPA has also not adequately supported the provision of the Final Rule that would permit pesticide spraying to continue or resume even when individuals not employed by the establishment enter onto an easement on a treated area.  As with the Boundary Provision, the EPA justified this change in administrative policy upon the factual finding that "the change to limit the AEZ within the boundaries of the establishment will [not] result in protections being weakened." 85 Fed. Reg. at 68,772-73.  For the reasons described above, that finding does not satisfy the standards articulated in *Fox*.  As with the Boundary Provision, the EPA has failed to provide any reasoned justification for why it reversed its earlier finding that the Easement Provision was necessary in order to protect workers and bystanders near pesticide applications.

The same issues apply to the Droplet Provision, which would reduce the AEZ from 100-feet for certain pesticide applications to 25-feet for all ground spray applications made from a height greater than 12 inches from the soil surface or planting medium.  *See* 85 Fed. Reg. at

68,774.  The agency stated that it made this change in order "to develop a simplified approach that is easier to understand and implement."  *Id*. at 68,775.  "EPA has concluded that the 2015 AEZ ground spray criteria are too complex, and in many cases, too restrictive, and the 'Do Not Contact' requirement would be better supplemented by the combination of a simplified AEZ and additional product-specific requirements where needed."  *Id*.  But the Agency's assertions are *ipse dixit* and underlying its policy is a finding—that the "do not contact" rule and enhanced training are redundant with the AEZ—that is contrary to the findings underlying the 2015 Rule.  Once again, the Agency was not bound to those findings, but before it departed from them it was required to acknowledge that it was doing so and to provide some reasoned justification.

### C.  Irreparable Harm

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  *Faiveley Transp.*, 559 F.3d at 118 (internal quotation marks omitted).  "Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages."  *N.Y. ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (internal quotation marks omitted).

On the current record, Plaintiffs have established that they will suffer irreparable harm if the challenged provisions of the Final Rule go into effect.  That being exposed to pesticides is harmful is obvious.  Evidence of such harm is also clearly presented in the declarations and exhibits submitted by Plaintiffs.  *See supra*.  As explained by Amy Liebman, Director of Environmental and Occupational Health for Plaintiff MCN:

> On the mild end of the spectrum, victims of acute exposure may experience nausea, vomiting, skin rashes, and/or eye irritation. Acute exposure may also result in severe symptoms such as convulsions and even death. Studies also show that on the more severe end of the spectrum, victims of chronic exposure can experience long-term neurological damage and can develop different types of cancer. Long term exposure can also cause reproductive issues, resulting in outcomes as severe as sterilization.

Liebman Decl. ¶ 12; *see also* Dkt. No. 15-1, Geoffrey M. Calvert et al., *Acute Pesticide Poisoning Among Agricultural Workers in the United States*, 1998-2005, 51 Am. J. Indus. Med. 883, 884 ("Pesticides are . . . an important source of injury and illness among farmers and farm workers.") (citation omitted); *id*. at 96 ("In addition to acute morbidity with it [sic] attendant costs in health care resources, and time lost from work and normal daily activities, acute pesticide poisoning is also associated with chronic adverse health sequelae.").

Studies cited in the 2015 Rule—proffered by the Plaintiffs here as exhibits—demonstrate that farmworkers are at risk of pesticide exposure, including exposure from off-target pesticide drift. *See, e.g.* Dkt. No. 15-1, Calvert et al. (2008) at 893 (identifying 1,942 separate pesticide exposure events between 1998 and 2005); *id*. at 893 (pesticide poisoning incidence among U.S. agricultural workers 39 times higher than the rate in all other industries combined).  Two such studies found that off-target pesticide drift is the most common factor contributing to pesticide exposure.  *Id*. at 891; Dkt. No. 15-2, Edward J. Kasner et al., *Gender Differences in Acute Pesticide-Related Illnesses and Injuries Among Farmworkers in the United States*, 1998-2007, 55 Am. J. Indus. Med. 571, 575, 575 (2012); *see also* Dkt. No. 15-3, Soo-Jeong Lee et al., *Acute Pesticide Illnesses Associated with Off-Target Pesticide Drift from Agricultural Applications*, 119 Env't Health Persp. 1162, 1166 (2011) (estimating that 14-24% of occupational pesticide poisoning may be attributed to off-target drift from agricultural applications).

This evidence establishes the irreparable harm that will follow if the challenged provisions of the Final Rule are put into effect.  *See also* Jordan Decl. ¶ 4 ("Given the robust

information and analysis used by EPA to justify the 2015 version of the AEZ provision, I expect the newly issued, weaker version of the AEZ provision will lead to more innocent workers and bystanders being made sick when they are sprayed by dangerous pesticides."); *id.* ¶ 5 (prior to the 2015 Rule, incidents of pesticide exposure "continued to occur despite the 'Do Not Contact' provision") (citing 2015 Rule at 67,496-01, 67,521, 67,254).

The harm is neither remote nor speculative.  Its imminence is detailed in the studies currently before the Court.  That evidence establishes that pesticide exposure poses a serious danger to the health of agricultural workers and bystanders, that off-target drift is a major source of such danger, *see* Trevino-Sauceda Decl. ¶ 10; Lopez Decl. ¶ 5, and that the Do Not Contact provision is, by itself, insufficient to eliminate the danger.  By undoing certain protections the EPA instituted to bolster the Do Not Contact provision, the Final Rule would pose a threat of irreparable harm to Plaintiffs' members.  *Mullins v. City of N.Y.*, 626 F.3d 47, 55 (2d Cir. 2010) ("The standard for preliminary injunctive relief requires a threat of irreparable harm, not that irreparable harm already have occurred."); *Coronel v. Decker*, 449 F. Supp. 3d 274, 281 (S.D.N.Y. 2020) ("irreparable harm exists where, as here, petitioners 'face imminent risk to their health, safety, and lives.'") (quoting *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 214 (E.D.N.Y. 2000), *aff'd sub nom. Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003)); *see also Homeland Sec.*, 969 F.3d at 86 ("because money damages are prohibited in APA actions, [injuries that would result from implementation of a federal agency rule] are irreparable.") (citing 5 U.S.C. § 702; *Ward v. Brown*, 22 F.3d 516, 520 (2d Cir. 1994)).[6]

_____

[6] The Government's argument that there is no irreparable harm because any harm depends upon the assumption that handlers will not abide by the Do Not Contact provision, *see* Op Br. at 27 n. 10, is unavailing.  As the Supreme Court has explained, the Court can rely on the "predictable effect of Government action on the decisions of third parties" when assessing harm.  *See Dep't of Com.*, 139 S. Ct. at 2566.  Moreover, the studies before the Court establish that the Do Not

**D. Balance of the Equities and Public Interest**

"[Second Circuit] precedent[] suggest[s] that the Plaintiffs may be able to show that a preliminary injunction is warranted on the strength of [likelihood of success on the merits and irreparable harm] alone." *Homeland Sec.*, 969 F.3d at 86 (citing *Trump v. Deutsche Bank AG*, 943 F.3d 627, 636, 640-41 (2d Cir. 2019), *rev'd on other grounds*, 140 S.Ct. 2019 (2020)). "Notwithstanding this possibility, [the Court] consider[s] the balance of equities and the public interest, as discussed in *Winter*." *Id*. (citing *Winter*, 555 U.S. at 7). Where plaintiffs seek an injunction against government action, the balancing of hardships and public interest factors merge. *Id*. at 58-59 (citation omitted). In addition, under *Eastern Air Lines*, the Court considers whether there will be "substantial harm to other interested persons," from the limited stay of the effective date of the Final Rule. *Eastern Air Lines*, 261 F.2d at 830.

On the record before the Court, the equities tip in favor of the Plaintiffs. As discussed *supra*, the Government has disavowed that the Final Rule will result in "any quantifiable cost savings for farms." 85 Fed. Reg. at 68,769. The only non-quantitative costs the Government has identified are the conclusory, non-particularized assertions by state regulators that the Rule has created enforcement challenges. Defendants have also not identified interested persons other than Defendants who would suffer harm, much less substantial harm, from the stay.

On the other side of the ledger, Plaintiffs stand to suffer an increased threat of pesticide exposure and its attendant harms—well documented in the record before the Court—if the Final Rule goes into effect. These harms stand to affect not only Plaintiffs but also members of the

---

Contact provision is not adequate to eliminate the harm of off-target pesticide drift. As discussed above, the AEZ was instituted in part to protect against instances of handlers *unwittingly* subjecting bystanders to pesticide exposure through drift. That can arise, for example, when an individual is within the AEZ but the handler incorrectly believes that they will not be contacted by a pesticide application. The Court's finding of irreparable harm therefore does not depend upon an assumption that any handler will willfully disregard the "do not contact" provision.

broader public who may live or wander near any field treated with pesticides. There are no

"additional considerations at play—for example, national security implications . . . or the need to

correct a previous policy that had been deemed unlawful." *Homeland Sec.*, 969 F.3d at 87

(citing *Winter*, 555 U.S. at 26).

For those reasons, both the balance of the equities and the public interest favor

maintaining the status quo and staying the effective date of the Final Rule until a hearing on the

motion for a preliminary injunction.

### E. TRO and Stay

Section 705 of Title 5 specifically permits a court, in advance of the effective date of a

regulation, to "issue all necessary and appropriate process to postpone the effective date of an

agency action." 5 U.S.C. § 705. The provision is a corollary to that in Section 706 of Title 5

which provides that when agency action is found to be "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law," the appropriate remedy is for the court to

hold the agency action unlawful and to set it aside. 5 U.S.C. 706(2)(A); *O.A. v. Trump*, 404 F.

Supp. 3d 109, 152 (D.D.C. 2019) ("[T]he APA mandates that the Court 'shall' 'set aside' the

challenged 'agency action.'"). "When a reviewing court determines that agency regulations are

unlawful, the ordinary result is that the rules are vacated—*not that their application to the*

*individual petitioners is proscribed.*" *National Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145

F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C.

Cir. 1989)) (emphasis added); *see also Homeland Sec.*, 969 F.3d at 87 (2d Cir. 2020) (quoting

*National Mining Ass'n*, 145 F.3d at 1409)); *Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d

544, 562 (D.C. Cir. 2015) (Kavanaugh, J., dissenting in part) ("Section 705 of the APA

authorizes courts to stay agency rules *pending judicial review* without any time limit on the

duration of the stay.").  It follows that when a court stays agency action pursuant to Section 705, it stays all (or at least the challenged part)[7] of the agency regulation as applied to all parties and not just to the parties before the Court.  *See O.A. v. Trump*, 404 F. Supp.3d at 153 ("[T]he [c]ourt would be at a loss to understand what it would mean to vacate a regulation, but only as applied to the parties before the [c]ourt."); *see also Pennsylvania v. Trump*, 351 F. Supp. 3d 791, 831 (E.D. Pa. 2019) ("[T]he national character of an APA violation ordinarily demands a national remedy.").  Even though the Court's order will have nationwide effect, the Court's writ is of more limited geographic scope: It is limited to the agency authorities who would otherwise take action to make the Final Rule effective and reflects no more than an application of the APA provisions permitting suit to be brough by any person "adversely affected or aggrieved by agency action."  5 U.S.C. § 702; *cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring) ("If district courts have any authority to issue universal injunctions, that authority must come from a statute or the Constitution.").[8]

---

[7] In its letter of December 26, 2020, the Government argued that if the Court stays the Final Rule it should stay only those portions that are challenged and found to be arbitrary and capricious, citing the severability provision of the Final Rule.  Dkt. No. 32 (citing 85 Fed. Reg. 68,760, 68,779).  That issue has not been fully briefed by either party.  The parties accordingly are invited to address the scope of the stay in connection with their papers addressing whether the stay should be vacated or modified.

[8] Although the Second Circuit has noted that "[t]he issuance of nationwide injunctions has been the subject of increasing scrutiny in recent years," *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d at 58, the cases it cited all arose in circumstances where a court enjoined an agency from enforcing a rule that is already in effect.  It is by no means obvious that the same analysis follows when the question is whether a regulation should be permitted to go into effect and when the relief sought or granted is not a restraint on officers enforcing a regulation that already has the force of law and that the agency has the responsibility to apply, but instead an order vacating agency action that has never taken effect so the agency can comply with the APA.  One concern with nationwide injunctions is that they can leave agency officers under conflicting obligations.  When one court enjoins enforcement of a rule already in effect and another court rejects a motion for an injunction, the agency can be left with conflicting duties – the obligation to enforce the law and regulations as in effect in the jurisdiction that has rejected the injunction and the obligation not to do so and to honor a court order where the court has issued an injunction.  No

Moreover, even if the standards for nationwide injunctions set forth in *United States v. Department of Homeland Security* were applicable here, the Court would find them satisfied. The Government has represented that there are no other lawsuits challenging the Final Rule pending in any other Court, the stay is of limited duration, and any party may move the Court for modification of the stay if another Court issues an order that would conflict with this Court's order.

## CONCLUSION

The application for a stay of the effective date of the Final Rule is GRANTED. The Court recognizes that it has entered the stay based only on the limited record, and limited briefing, it has received. Accordingly, the Court will stay the effective date of the challenged portions of the EPA regulation only for 14 days, until January 12, 2021, pursuant to 5 U.S.C. § 705, pending a hearing on the application for a preliminary injunction. The Court will hold a hearing at 2:30 p.m. on January 8, 2021, as to whether the stay and restraining order should be continued and a preliminary injunction granted or alternatively whether the stay and restraining order should be lifted or modified. Parties should dial 888-251-2909 and use access code 2123101. The Agency shall file the full administrative record in accordance with the deadline set forth by the Court in a separate order and the parties are invited to submit briefs and supporting evidence on the schedule set forth therein.

SO ORDERED.

Dated: January 29, 2021
     New York, New York
                                      LEWIS J. LIMAN
                            United States District Judge

---

such conflict arises in the circumstances here where the Final Rule is not yet in effect.